[Civ. No. 5178. Fourth Dist. Aug. 8, 1956.]

ANTONIO TAVARES et al., Respondents, v. GLENS FALLS INSURANCE COMPANY (a Corporation), Appellant.

McCutchen, Black, Harnagel & Greene, Harold A. Black and Philip K. Verleger for Appellant.

Luce, Forward, Kunzel & Scripps for Respondents.

MUSSELL, J.—This is an action on an insurance policy to recover a fine and expenses paid by plaintiffs to the government of Ecuador for an alleged violation of the law of Ecuador prohibiting the passage of fishing boats without a fishing permit through its claimed territorial seas. The policy, issued on May 27, 1952, by the defendant Glens Falls Insurance Company, insures the plaintiffs, in respect to a vessel called the "Sun Pacific," against

"(9) Liability for fines and penalties for the violation of any of the laws of the United States, or of any State thereof, or of any foreign country; provided, however, that the Company shall not be liable to indemnify the Assured against any such fines or penalties resulting directly or indirectly from the failure, neglect, or default of the Assured or his managing officers or managing agents to exercise the highest degree of diligence to prevent a violation of any such laws."

The policy contains a further provision, by endorsement, in part, as follows:

"F. C. & S. Clause. Notwithstanding anything to the contrary contained in the Policy, this insurance is warranted free from any claim for loss, damage or expense caused by or resulting from capture, seizure, arrest, restraint or detainment, or the consequences thereof or any attempt thereat, or any taking of the Vessel, by requisition or otherwise, whether in time of peace or war and whether lawful or otherwise. . . ."

The Sun Pacific is a tuna fishing vessel of approximately 250 tons capacity and is one of a fleet of other such vessels which sail from the port of San Diego and fish off the coast of Mexico, Central and South America. On July 29, 1952,

while the vessel was proceeding through the claimed territorial waters of Ecuador and was approximately 16 miles from the next point of land and within the 12-mile limit claimed by Ecuador, officers of that country stopped it and ordered the captain to take it to the Ecuadorian port of Manta. The Ecuadorian Coast Guard official told Frank Dolph, master of the Sun Pacific, that the vessel was being seized because they were fishing without a license.

On or about August 2, 1952, the owners of said vessel were compelled to deposit with the Minister of Economics of Ecuador the sum of $11,600 to secure the release of said vessel. This deposit was made under an agreement that it was to be security for any fine subsequently levied or assessed against the owners of said vessel by Ecuador for a violation of law. On May 10, 1954, the Ecuadorian government levied a fine against the owners of the vessel in the sum of $11,616.30 and applied the sum deposited by the owners in payment of the fine. In an attempt to meet the charges made by the Ecuadorian authorities and to avoid payment of the fine, plaintiffs expended $1,540.07 to defray expenses of an officer of the Tunaboat Owners Association to Ecuador, and for attorneys' fees.

The trial court herein rendered judgment in favor of the plaintiffs and the defendant appeals. The court found, among other things, as follows:

"VII. That the levying of the aforesaid fine was not the result of the failure, neglect or default of the Plaintiffs or any of them, or their managing officers or agents to exercise the highest degree of diligence to prevent the aforesaid violation of law."

"IX. That said fine did not result from any loss, damage or expense sustained by reason of any provision of the endorsement to said insurance policy denominated the F. C. & S. Clause; nor did said fine result from a violation of the laws of Equador (sic) with the knowledge of Plaintiffs, or any of them."

Appellants contend that finding number seven has no support in the evidence and that the F. C. & S. clause of the policy excluded liability for fines consequent upon seizure for violation of the Ecuadorian law.

The Ecuadorian law involved, insofar as it is pertinent here, is as follows:

"Decree 003 of Feb. 26, 1951, provided in part:

"No fishing vessel of foreign flag may enter into Ecuadorian

territorial seas without being provided with the matriculation, the fishing permit, and other pertinent documents."

Ecuadorian territorial waters were defined as including an area within . . . "12 nautical miles measured from the line of the lowest tide at the most projecting points of the Ecuadorian coast. . . ." Section 52 of the same law provided "(t)here shall be considered as crime of contraband . . . (a) Entry into territorial seas of the Republic without carrying along the Matriculation and Fishing Permit. . . . " This Ecuadorian decree was protested by the United States on June 7, 1951, as contrary to the position of the United States that no nation may properly claim more than three miles out to sea. The decree was never published in the United States nor were its terms made known in San Diego by the Ecuadorian government through its consul who dealt constantly with tunaboat representatives. It was stipulated that a copy of this decree could have been in the Los Angeles County Library, but that a copy of it was not obtainable in either the San Diego Law Library or the public library.

It appears from the testimony of William B. Stern, an expert on foreign law, that the precise distance to which any nation may extend claims of jurisdiction offshore its borders has been a subject of dispute between nations since the Middle Ages, and that there does not appear ever to have been reached any particular unanimous agreement among them. ■ Mr. Stern testified that in his opinion the Ecuadorian decree did not prohibit innocent passage and that "the doctrine of innocent passage is one of the unwritten international laws." In this connection the record shows that the vessel here involved was effecting an innocent passage through the claimed territorial waters of Ecuador and was not engaged in fishing in such waters. Plaintiffs were fined by the Ecuadorian government because the vessel was effecting an innocent passage.

There was a conflict in the evidence as to whether the plaintiffs exercised the highest degree of diligence to prevent the violation of the Ecuadorian law and we conclude that the evidence in this connection was sufficient to support the trial court's finding number seven.

Mr. Dolph, master of the vessel, testified that there was no fishing from the Sun Pacific off the coast of Ecuador and that his purpose in traversing his course off the coast of that country was to reach the banks off the coast of Peru; that at the time the vessel was stopped, he did not know that he was

within the territorial waters of Ecuador. Roman Luz, fishing captain of the vessel, testified that they were stopped at about 9 p. m. on July 29, 1952, and at the time they were watching a movie and were running for the Peruvian banks.

Evidence was introduced of a news article in the San Diego Union dated February 5, 1952, indicating that the Ecuadorian consul in San Diego had stated that the action of his government on February 26, 1951, was to ban American and other fishing craft "from obtaining bait and tuna for twelve miles off shore from the coast line." A waterfront reporter for 44 years in San Diego testified that he had interviewed the Ecuadorian consul many times in 1951 and 1952 and had never been advised by him that Ecuador prohibited the innocent passage of fishing vessels through its claimed territorial waters. A customhouse broker in San Diego who, in connection with the clearance of vessels, handled their work with the various governmental, customs and immigration agencies and the landing and clearing of port in various foreign countries, testified that he cleared approximately 50 fishing vessels through the Ecuadorian consul during 1951 and 1952, and that the consul had never advised him that the government of Ecuador prohibited the innocent passage of fishing vessels through its claimed territorial waters. Several masters of other tuna fishing vessels testified to the effect that they made trips to fish off the coast of Peru and were never advised that Ecuador forbade the innocent passage of vessels through its claimed territorial waters.

J. J. Marks, a port captain for Westgate-California Tuna Packing Company for 10 years and part owner of the Sun Pacific, testified that the 12 mile limit meant that vessels are forbidden to fish within said limit and that this was the understanding of those with whom he had discussed the question. A news letter of the American Tunaboat Owners Association, dated May 15, 1951, concerning the Ecuadorian decree of February 6, 1951, contained no indication that innocent passage was prohibited by Ecuador and the article listed the illegal operations which were in fact prohibited. In this connection appellant states that in November, 1951, the fishing vessel Notre Dame was seized by the Ecuadorian authorities for violation of the same law as that involved in the instant case and that that fact was known to the owners of the Sun Pacific. However, there was substantial testimony to the effect that it was common knowledge that the Notre Dame was seized because it was fishing in the territorial waters of Ecuador.

The foregoing facts and the reasonable inferences to be drawn therefrom furnish sufficient support for the trial court's finding number seven. ■ There is no presumption as to knowledge of a law where the law is the law of a foreign country. It is said in *Marshall* v. *Coleman,* 187 Ill. 556 [58 N.E. 628, 637]:

"The maxim, 'Ignorantia legis nemineum excusat,' has no application here, for the reason that mistakes as to foreign laws are regarded as mistakes of fact. Ignorance of law which will not excuse is ignorance of the laws of one's own country or state, but the laws of foreign countries or other states are facts. *Schaefer* v. *Wunderle,* 154 Ill. 577 [39 N.E. 623]."

Whether or not the highest degree of diligence was exercised by the plaintiffs is a question of fact based upon the circumstances. As is said in *Spalt* v. *Eaton,* 118 N.J.L. 327 [192 A. 576, 579]:

"And the Massachusetts courts hold that the standard of care imported by the term 'highest degree of care' is 'reasonable or due care under the circumstances.' *Thayer* v. *Old Colony Street Railway Co.,* 214 Mass. 234 [101 N.E. 368, 370, 44 L.R.A.N.S. 1125, Ann.Cas. 1914B 865]. The circumstances necessarily enter into the consideration of what is 'a high degree of care' in the particular case. See *Partridge* v. *Woodland Steamboat Co.,* 66 N.J.Law, 290 [49 A. 726]."

■ Appellant contends that the exclusion in the policy "for or in respect of any loss, damage or expense sustained by reason of capture, seizure, arrest, restraint or detainment or the consequences thereof, or any attempt thereat" is applicable herein and that, therefore, appellant is not liable as a matter of law. We are not in accord with this contention. The loss in the instant case was occasioned by the levying of a fine against the owners of the vessel involved. Paragraph nine of the policy insured the plaintiffs against loss by reason of fines and penalties levied by the laws of Ecuador. There is a distinction between loss and damage to a vessel by reason of capture, seizure and arrest and loss suffered by reason of a violation of law. To hold in the instant case that the F. C. & S. clause is applicable is to hold that the provisions of paragraph nine of the policy are meaningless. A more reasonable construction of the insurance contract is to give effect to the provisions of paragraph nine under the circumstances of the instant case. In *Hobson* v. *Mutual Benefit H. & A. Assn.,* 99 Cal.App.2d 330, 333 [221 P.2d 761], it is held that in construing an

insurance policy it must be borne in mind that where two constructions are reasonable, that which is more favorable to the insured should be adopted, and that:

"There are three legal principles which apply to this situation: (1) Where two clauses of an agreement are repugnant, 'the first shall be received and the latter rejected.' (12 Am.Jur. 778, sec. 243; *Burns* v. *Peters*, 5 Cal.2d 619 [55 P.2d 1182].) (2) That clause 'which affords the most protection to the insured will control and be given effect.' (1 Couch, Cyclopedia of Insurance Law, 369; *Frenzer* v. *Mutual Ben. H. & A. Assn.*, supra [27 Cal.App.2d 406 (81 P.2d 197)].) (3) '. . . a proviso which is utterly repugnant to the body of the contract and irreconcilable with it will be rejected; likewise a subsequent clause irreconcilable with a former clause and repugnant to the general purpose and intent of the contract will be set aside.' (*Jones* v. *Pennsylvania Casualty Co.*, 140 N.C. 262 [52 S.E. 578, 5 L.R.A.N.S. 932, 111 Am.St.Rep. 843].)"

Appellant cites *Cory* v. *Burr*, 8 L.R.A.C. 403, and other cases, in support of its contention that the loss was occasioned by the capture and seizure of the vessel involved. In the Cory case an action was brought against the insurance carrier by the owners of a vessel, alleging that there was a loss under a hull policy occasioned by barratry. The vessel had been seized by the Spanish authorities for smuggling tobacco. The owners recovered the vessel from the Spanish authorities by the payment of a sum of money and the owners then brought an action to recover the money so paid. The court held that any loss to the owners was occasioned by the seizure of the vessel and that therefore the loss was excluded under the F. C. and S. clause of the policy. This case and other cases cited by appellant do not involve the construction of an insurance policy containing the insuring clause set forth in paragraph nine of the policy herein and such cases are not here controlling.

The judgment is affirmed.

Barnard, P. J., and Burch, J. pro tem.,* concurred.

A petition for a rehearing was denied August 30, 1956, and appellant's petition for a hearing by the Supreme Court was denied October 4, 1956.

---

*Assigned by Chairman of Judicial Council.