[No. C011331. Third Dist. Aug. 31, 1992.]

MID-CENTURY INSURANCE COMPANY, Plaintiff and Respondent, v. RON GARDNER, Defendant and Appellant.

**COUNSEL**

Jay-Allen Eisen, Marian M. Johnston, Ann Perrin Farina and Clayeo C. Arnold for Defendant and Appellant.

Kroloff, Belcher, Smart, Perry & Christopherson, Orlie L. Curtis and Clinton P. Walker for Plaintiff and Respondent.

**OPINION**

**SPARKS, J.**—Plaintiff Mid-Century Insurance Company brought this action for a declaration that it had no duty to pay benefits to its insured, defendant Ron Gardner, for personal injuries he sustained in an accident with an uninsured driver.[1] It claimed the policy Mr. Gardner had purchased offered no coverage. The parties stipulated to a trial before a temporary judge, who ruled in the plaintiff insurer's favor and entered judgment accordingly. With

---

[1] Financial Indemnity Company was also named as a defendant below, but did not appeal from the judgment.

respect to the explicit basis for the ruling, Mr. Gardner asserts the temporary judge improperly disregarded the corporate form of his business in applying one of the policy's exclusions. Mr. Gardner also argues that neither of the other policy exclusions urged below by the plaintiff insurer has any application to the facts of this case. We agree and shall reverse.

## BACKGROUND

The matter was submitted to the temporary judge on deposition excerpts and exhibits, which make for disjointed reading on appeal. We shall do our best to assemble the pertinent facts from this record, with any conflicts resolved or inferences drawn in favor of the judgment.

Saving the facts of disputed significance for the discussion, we begin with those which serve as a framework. Mr. Gardner started working as a landscape contractor in Chico in 1959, incorporating in 1986 as Gardner's Landscaping, Inc. The corporation maintained a "commercial vehicle" insurance policy with Financial Indemnity Company, which on amended declarations (bearing an effective date of Mar. 13, 1987) listed 17 vehicles registered to the corporation (beginning with a 1975 "Ford F700 Dump" and ending with a 1987 Ford half-ton pickup truck). Among these was a 1987 Nissan pickup truck, listed as unit "023." The policy included coverage of $30,000 per person for bodily injury resulting from an accident involving an uninsured motorist.

In April 1987, Mr. Gardner was driving the 1987 Nissan pickup truck on corporation business when he was involved in an accident with an uninsured motorist. The parties do not dispute that he sustained serious bodily injuries in an amount in excess of $30,000.

At the time of the accident, the plaintiff insurer had issued several identical automobile insurance policies to Mr. Gardner as the "named insured." The vehicles covered under these policies were a 1986 Cadillac Fleetwood, a 1978 Ford van, a 1980 VW Rabbit, and a 1979 Datsun 280Z. The policy that was admitted as a trial exhibit covered the Cadillac. The policies provided $100,000 in benefits for bodily injuries caused by an uninsured motorist. All these vehicles, however, were actually owned by the corporation.

The procedural background of this matter is uncomplicated. Mr. Gardner demanded uninsured motorist benefits from both the plaintiff insurer and Financial Indemnity Company. Apparently, Financial Indemnity Company

paid him the bulk of the $30,000 limits under its policy with him and tendered the remainder. The plaintiff insurer, on the other hand, refused his tender and filed this declaratory relief action in 1989. The temporary judge issued a statement of decision in which he determined Mr. Gardner "exercised and possessed the same incidents of ownership and control over th[e] vehicles" insured through either insurance company, and was an "owner-in-fact" of the 1987 Nissan pickup truck in which he was injured, so the plaintiff insurer was not obligated to pay benefits by virtue of an exclusion in the policy precluding benefits for injuries occurring while occupying a vehicle owned by the insured but not afforded coverage under the policy. Not receiving any objection to the statement of decision, the temporary judge entered judgment in favor of the plaintiff insurer in April 1991. This appeal followed.

## DISCUSSION

### I

We initially consider the stated basis for the temporary judge's ruling. There can be no dispute that Mr. Gardner is the explicit "named insured" under the plaintiff's policies.[2] The question then is whether he is nevertheless excluded under the terms of the policy. To quote the exact language of the exclusionary clause in question, "This coverage does not apply to bodily injury sustained by a person: [¶] 1. While occupying a motor vehicle *owned by you* or a family member for which insurance is not afforded under this policy . . . ." (Italics altered.) Consequently, in order for this exclusion to apply, it must be shown Mr. Gardner "owned" the 1987 Nissan pickup truck insured by Financial Indemnity Company in which he was riding at the time of the accident. The plaintiff insurer attempts to demonstrate this in two ways. First (in an argument made clear only in oral argument), it asserts that "[b]y any ordinary reasonable definition [of 'owned,'] he owned it." Second, it argues Mr. Gardner "has such unity of interest and identity with the

---

[2]The plaintiff insurer had sought to amend its complaint to add a cause of action for reformation (to change the named insured to the corporation) or rescission based on its "discovery" at a deposition in April 1990 that the corporation actually owned the Cadillac, not Mr. Gardner. It subsequently withdrew this motion, only to resurrect the issue at trial. Both defendants objected to this belated effort to amend the complaint. The temporary judge agreed to allow the defendants to reopen the trial if he granted the plaintiff's motion, at which point the plaintiff withdrew its attempt to seek rescission based on the purported material misrepresentation. It did, however, argue in favor of reformation. The temporary judge did not explicitly rule on the issue.

On appeal, the plaintiff revives the misrepresentation argument as a basis for voiding coverage under the policy. It makes no argument in favor of reforming the policy to list the corporation as the named insurer. With respect to either issue, principles of waiver preclude our consideration.

corporation that the corporate veil should be pierced." We approach these in turn.

## A.

■ As was pointed out below by Financial Indemnity Company, the plaintiff insurer's policy simply uses the term "owned" without giving it a more specialized definition. We therefore begin by applying the meaning a reasonable person would ordinarily give the term. (*Reserve Insurance Co.* v. *Pisciotta* (1982) 30 Cal.3d 800, 807 [180 Cal.Rptr. 628, 640 P.2d 764].) According to Webster's Third New International Dictionary (1971), to "own" is "to have or hold as property or appurtenance: have a rightful title to, whether legal or natural: Possess . . . ." (P. 1612.)

Under the ordinary sense of this definition, Mr. Gardner did not own the vehicle in which he was injured. Title to the 1987 pickup truck was in the corporation's name, which held the vehicle as its property. Regardless of the extent to which Mr. Gardner owned or controlled the corporation as a stockholder and executive officer (including the use of the pickup truck), this does not confer upon him the corporation's title to the truck. "[I]t cannot be said that the facts disclose a sale [of the real property] by trustees to themselves. . . . [T]he trustees, though directors and stockholders of the defendant bank, were not *the bank*." (*Copsey* v. *Sacramento Bank* (1901) 133 Cal. 659, 662 [66 P. 7] [italics in original]; accord, *Miller* v. *McColgan* (1941) 17 Cal.2d 432, 436 [110 P.2d 419, 134 A.L.R. 1424] [stockholders do not own corporate property]; *Bainbridge* v. *Stoner* (1940) 16 Cal.2d 423, 428 [106 P.2d 423] [directors do not hold title to corporate property in their charge]; *Gorham* v. *Gilson* (1865) 28 Cal. 479, 484 [stockholders "never had any title, legal or equitable, to the property" of which the corporation was defrauded].) Nor did Mr. Gardner "possess" the pickup truck other than to operate it.

The plaintiff's efforts to demonstrate that Mr. Gardner owned the truck in the "ordinary" sense of the word are self-defeating, because if there *are* multiple meanings we must choose the one which will achieve the policy's object of providing coverage for loss. (*Reserve Insurance Co., supra*, 30 Cal.3d at pp. 807-808.) Therefore, we need not recount the cases it cites for the principle that ownership of a vehicle for insurance purposes is not limited to the entity holding title. If there are multiple possible "owners" of a vehicle, it was incumbent upon the plaintiff to make clear which types of ownership would work a forfeiture of coverage under the policy. (*Id.* at p. 808.) Having failed to specify in its exclusion that ownership could be anything other than holding the title of record (which is certainly ownership

in its most ordinary sense), the plaintiff cannot apply this exclusion merely based on Mr. Gardner's dominion over the pickup truck. Although we are by no means certain this is what the temporary judge meant in labelling Mr. Gardner the "owner-in-fact" of the 1987 Nissan pickup truck, this conclusion would be legally erroneous and the judgment cannot be premised upon it.

### B.

Since, for purposes of the plaintiff's exclusionary clause, it is the corporation which owned the 1987 pickup truck, the plaintiff can come within the ambit of the clause only by disregarding the corporate form of Gardner's Landscaping in order to show that Mr. Gardner actually "owned" the pickup truck. This would require us to apply the suggestively named doctrine of "piercing the corporate veil." (See 9 Witkin, Summary of Cal. Law (9th ed. 1989) Corporations, § 12, p. 524.) We shall recount the principles relevant to this doctrine, and then determine if the plaintiff's evidentiary showing was sufficient to warrant its application.

### 1.

■ "The alter ego doctrine arises when a plaintiff comes into court claiming that an opposing party is using the corporate form unjustly and in derogation of the plaintiff's interests." (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300 [216 Cal.Rptr. 443, 702 P.2d 601].) The elements of the doctrine are at least easily stated. "There is no litmus test to determine when the corporate veil will be pierced; rather[,] the result will depend on the circumstances of each particular case. [(*H. A. S. Loan Service, Inc.* v. *McColgan* (1943) 21 Cal.2d 518, 523 [133 P.2d 391, 145 A.L.R. 349].)] There are, nevertheless, two general requirements: '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' " (*Mesler, supra,* 39 Cal.3d at p. 300.) As the *Messler* court noted, "The issue is not so much whether, for all purposes, the corporation is the alter ego of its stockholders or officers, nor whether the very purpose of the organization of the corporation was to defraud the individual who is now in court complaining, as it is an issue of whether in the particular case presented and for the purposes of such case justice and equity can best be accomplished and fraud and unfairness defeated by a disregard of the distinct entity of the corporate form." (*Id.* at pp. 300-301 [internal quotation marks deleted].)

It is the plaintiff's burden to overcome the presumption of the separate existence of the corporate entity. (*MacPherson v. Eccleston* (1961) 190

Cal.App.2d 24, 27 [11 Cal.Rptr. 671].) The issue is one for the trier of fact and is reviewed on appeal according to the usual standards for sufficiency of the evidence to support the conclusion. (*H. A. S. Loan Service, Inc., supra,* 21 Cal.2d at p. 524.)

The appellate court in *Associated Vendors, Inc.* v. *Oakland Meat Co.* (1962) 210 Cal.App.2d 825 [26 Cal.Rptr. 806] made the heroic effort of cataloguing the factors that courts had considered in determining whether a corporate veil was properly pierced, which we summarize in the margin (paraphrasing or skipping certain factors because that opinion involved a creditor seeking to reach another corporation rather than an individual).[3] The courts have cautioned against relying too heavily in isolation on the factors of inadequate capitalization or concentration of ownership and control. (E.g., *id.* at pp. 841-842; *Arnold* v. *Browne* (1972) 27 Cal.App.3d 386, 394 [103 Cal.Rptr. 775]; *MacPherson, supra,* 190 Cal.App.2d at pp. 27-28.) The *Associated Vendors, Inc.,* court also warned against stretching the concept of inequity too far: "Certainly, it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced, and thus set up such an unhappy circumstance as proof of an 'inequitable result.' In almost every instance where a plaintiff has attempted to invoke the doctrine he is an unsatisfied creditor. The purpose of the doctrine is not to protect every unsatisfied creditor, but rather to afford him protection, where some conduct *amounting to bad faith* makes it inequitable, under the applicable rule above cited, for the equitable owner of a corporation to hide behind its corporate veil." (210 Cal.App.2d at p. 842 [italics added].)

2.

The only evidence relevant to the question of piercing the corporate veil came from the excerpts of Mr. Gardner's deposition read into the record. According to Mr. Gardner, he is listed as chief executive officer of Gardner Landscaping, Inc. Although he was not sure if any stock had been issued, he

---

[3]The relevant considerations include: the commingling of funds and other assets; the failure to segregate funds of the individual and the corporation; the unauthorized diversion of corporate funds to other than corporate purposes; the treatment by an individual of corporate assets as his own; the failure to seek authority to issue stock or issue stock under existing authorization; the representation by an individual that he is personally liable for corporate debts; the failure to maintain adequate corporate minutes or records; the intermingling of the individual and corporate records; the ownership of all the stock by a single individual or family; the domination or control of the corporation by the stockholders; the use of a single address for the individual and the corporation; the inadequacy of the corporation's capitalization; the use of the corporation as a mere conduit for an individual's business; the concealment of the ownership of the corporation; the disregard of formalities and the failure to maintain arm's-length transactions with the corporation; and the attempts to segregate liabilities to the corporation. (*Id.* at pp. 838-840.)

agreed with the statement that he owned the stock alone or in combination with his wife. He stated he completely managed and controlled the corporation. The day-to-day operations of the business were unaffected by incorporation. He, like all the other employees of the corporation (including his daughter), was paid a salary; he did not receive dividends. The amount was the same as what he previously had received on a draw for his living expenses. If the business had earnings greater than that, they were reinvested in the corporation. No one received any money from the corporation unless they were employees. There was a "single" bank account for the corporation, the same one as the business had used before incorporation.

The only vehicle of which he or his wife made personal, nonbusiness use was the 1986 Cadillac. He admitted he did not personally own any vehicles; all vehicles, including the Cadillac, were owned by the corporation. The corporation also paid the premiums on the vehicles insured by the plaintiff. His explanation for this perquisite was that he did "a lot of business that would be . . . out on the road at various times where I could take—be taking someone to lunch or we could be going out with maybe a business party, and I used the Cadillac." He acknowledged that the registration for three commercial vehicles acquired in 1988-1989 listed him personally as an owner. In charge of purchasing the vehicles, he did not and would not have any purpose in telling the dealer to list title in that manner. He assumed the dealer made an error; the vehicles were supposed to be listed solely in the corporation's name.

With respect to the circumstances under which the Cadillac and other vehicles came to be insured with the plaintiff rather than Financial Indemnity Company, Mr. Gardner stated he normally sent all his insurance business for the corporation to his regular insurance agency (Lindo, Hanna & Abbott). Either he would call the agency or have his office call it whenever he added or eliminated vehicles. The agency was aware he always wanted the "best" insurance; he would simply tell them he wanted coverage and leave the arrangements to them. This included the amount of uninsured motorist coverage. He was not personally aware why certain vehicles wound up being insured by the plaintiff, nor has he asked his agent about this since the accident. The plaintiff's agent testified he dealt with Mr. Gardner's daughter. She had been referred to the agent by the Gardner's usual agency because it did not handle personal automobile insurance. She referred to the vehicles to be insured by the plaintiff as her father's.

The temporary judge identified the following facts before reaching his conclusion: "Mr. Gardner incorporated his landscaping business in 1986, he or his wife owned all the stock, he is the manager and controls the operations

of the corporation, he takes his salary depending upon his living needs, and there was no change in the day to day operations of the business after incorporation. Mr. Gardner handles the business of the corporation and obtains insurance for personal and business needs. Mr. Gardner testified at his deposition that all of the vehicles, including those insured by Mid-Century under policies listing him as a named insured, were actually owned by Gardner Landscaping, Inc. He was unable to state why certain vehicles were insured by Financial Indemnity and certain ones with Mid-Century." (Capitalization, paragraphing and numbering deleted.) As we earlier summarized, the temporary judge concluded, "16. It is the Court's finding that Mr. Gardner exercised and possessed the same incidents of ownership and control over those vehicles that were not insured through Mid-Century, but instead through Financial Indemnity, as he did over those vehicles insured through Mid-Century. [¶] 17. It is the further finding of this Court that Mr. Gardner was the owner-in-fact of the vehicle he was driving at the time of the incident and that the exclusion in the Mid-Century policy . . . is applicable." (Capitalization omitted.)

█ Under the factors set out earlier, neither the facts relied upon by the temporary judge nor the totality of the facts adduced at trial are sufficient to support a conclusion that Gardner Landscaping's corporate entity should be disregarded for the purpose of establishing Mr. Gardner as the owner of the pickup truck in which he was injured. The plaintiff has a gaping lacuna in its proof with respect to *any* evidence that Mr. Gardner generally treated corporate assets as his own or disregarded the separate nature of the business. About the only factor to which the plaintiff can point is Mr. Gardner's domination of ownership and control, but we have already pointed out this factor is not significant in isolation. The plaintiff misreads the record in asserting Mr. Gardner took money from the corporation whenever he needed it—the record clearly shows he was paid a salary. The fact that the day-to-day operations of the business are unchanged is of no significance whatsoever in and of itself; what *would* have been relevant were any facts to show he had not stopped treating the business as his personal property. The fact three vehicles were registered *by a dealer* in Mr. Gardner's name along with the corporation at some point after the accident is of minimal probity (if any), and was not even noted by the temporary judge. Otherwise, we are simply presented with the fairly common circumstance of a corporation providing its executive officer with the perquisite of vehicles for his personal use and the concomitant insurance. No rational inference of subterfuge may be drawn from this. Nor do we find any particularly inequitable result. The plaintiff received premiums from Mr. Gardner for uninsured motorist coverage, which was not limited to the vehicles insured under the policy. There is no evidence he manipulated the insurers to the nefarious end of evading the

plaintiff's contractual exclusion of coverage on other owned-but-not-in-sured-with-it vehicles (an exclusion which does not exclude a risk of such magnitude that it is unconscionable to impose liability on the plaintiff). In short, we find absolutely no factual basis for establishing the elements under which the plaintiff may pierce Gardner Landscaping's corporate veil, so to the extent the temporary judge's conclusions are based on this doctrine they cannot stand.

### 3.

Having found Mr. Gardner did not own the vehicle in which he was injured in the ordinary sense of the word used in the policy, and having concluded it is improper to deem him the owner in his corporation's stead, the exclusion on which the temporary judge relied is inapplicable. This is not, however, the end of our task. It is axiomatic we review judicial action, not judicial reasoning. (*Constance B. v. State of California* (1986) 178 Cal.App.3d 200, 211 [223 Cal.Rptr. 645].) Having found the exclusion on which the trial court relied to be inapplicable, we must next consider the other exclusions urged by the plaintiff below in the event the temporary judge had determined Mr. Gardner did *not* own the vehicle in which he was injured.

### II

Unlike the "other-car" exclusion we have just discussed, the other exclusions on which the plaintiff relies require a quick overview of the plaintiff's policy. Under the general definitions section, " 'you' or 'your' mean the 'named insured' shown in the Declarations . . . ." This, of course, is Mr. Gardner. Following the coverage for bodily injury/property damage liability appears "PART II—UNINSURED MOTORIST" coverage, under which the plaintiff insurer promised to "pay *damages* for *bodily injury* which an *insured person* is legally entitled to recover from the owner or operator of an *uninsured motor vehicle*." (Italics in original.) An "insured person" under the specific part II definition is the named insured, a family member, any occupant of the named insured's "insured car" (here, the Cadillac),[4] and any person entitled to recover damages because of injury to the named insured, the named insured's family, or occupants of the insured car. Next comes the "Exclusions" section. To quote the provision pertinent to this appeal, "This coverage does not apply to *bodily injury* sustained by a person: . . . [¶] 4. If the injured person was *occupying* a vehicle [that the named insured] do[es]

---

[4]This term is among the policy's general definitions. "Your insured car" is the vehicle listed on the declarations page or its replacement, any after-acquired vehicle, and any temporary substitute for the vehicle listed on the declarations page.

not own which is insured for this coverage under another policy." (Italics in original.) After a section devoted to the limits of liability, part II contains a section titled "Other Insurance." The other exclusion pertinent to this appeal appears as paragraph 4: "We will not provide insurance for a vehicle other than *your insured car*, unless the owner of that vehicle has no other insurance applicable to this part." (Italics in original.) Part II concludes with an arbitration provision.

### A.

The two quoted exclusions (for ease of reference, the "Exclusions" exclusion and the "Other Insurance" exclusion) each deal with the effect of other insurance. It has been noted that "insurance carriers planning their policies have several alternatives open to them when faced with the situation where their insured is covered under more than one policy for the same injury. In some cases, they can make their coverage inapplicable. Or they can make it applicable only as excess." (1 Eisler, Cal. Uninsured Motorist Law (4th ed. 1990 rev.) § [15.10], p. 15-2.) As an example, "suppose A, while a passenger in B's automobile, is injured by a negligent uninsured motorist. If B has uninsured motorist protection in the policy covering his car, that policy affords what we classify as primary coverage. If A is the named insured in another policy which includes uninsured motorist coverage, then that protection, and any other which might apply to A in this situation, is termed secondary." (*Id.* at p. 15-3.) As Eisler continues, "Insurance Code Section 11580.2(c)(2)[5] allows A's insurer to preclude coverage altogether where, as above, A is injured while riding in B's car if B's car has uninsured motorist coverage." (*Id.* at § [15.20], p. 15-3.)

### B.

■ With respect to the "Exclusions" exclusion for bodily injury suffered by an injured person who was occupying a vehicle not owned by a named insured "which is insured for *this coverage* under another policy" (italics added), the plaintiff insurer points out this provision is authorized by Insurance Code section 11580.2, subdivision (c)(2). It then cites a number of cases which interpret the expression "similar" insurance used in the various policies at issue in the cases (in reflection of the statute's usage) as precluding recovery by injured guests under their own uninsured motorist insurance when their damages exceeded the minimum uninsured motorist coverage

---

[5]This statute provides in relevant part, "The insurance coverage provided for in this section [dealing with uninsured motorist coverage] does not apply either as primary or excess coverage to: . . . bodily injury of the insured while in or upon or while entering into or alighting from a motor vehicle other than the described motor vehicle if the owner thereof has insurance *similar to* that provided in this section." (Italics added.)

carried on the host's car.[6] However, in *Hefner v. Farmers Ins. Exchange* (1989) 211 Cal.App.3d 1527 [260 Cal.Rptr. 221] (which the plaintiff insurer unsuccessfully attempts to distinguish), the court interpreted an exclusion containing the exact policy language at issue here. (*Id.* at p. 1533.) The *Hefner* court ruled that regardless of how the expression "similar to" in the underlying Insurance Code section should be interpreted (*id.* at p. 1532), the language actually used in the policy—"this coverage"—was ambiguous (in light of the policy as a whole) whether it meant the *type* of coverage (uninsured motorist coverage) or the *amount* of coverage. (*Id.* at pp. 1533-1534.) Resolving the ambiguity in favor of the insured's reasonable expectation, the court interpreted the policy as excluding coverage only when the host car's insurance was equal or greater to the amount afforded under the injured guest's uninsured motorist coverage. (*Id.* at pp. 1534-1535.) "Accordingly, we interpret 'this coverage' to mean uninsured motorist coverage with the limits contained in the policy in which the language is used (Farmers policy). Since [the host's] policy limits were less than the Farmers's policy limits, the exclusion does not apply." (*Id.* at p. 1534.) As defendant Gardner correctly notes, the policy at issue here is identical in all material respects to the Farmers policy in *Hefner*. In light of *Hefner*, we agree that this exclusionary clause does not deprive Gardner of coverage under the policy in question.

However, *Hefner* did not consider the effect, either in conjunction with this ambiguity or by itself, of the "Other Insurance" exclusion. We now undertake that task.

## C.

As noted, the "Other Insurance" exclusion declared (with our bracketed editorial comment) that plaintiff insurer "will not provide insurance for a vehicle other than your insured car [the Cadillac] unless the owner [the corporation] of that [other] vehicle [the Nissan pickup] has no other insurance applicable to this part [part II, dealing with uninsured motorists]." (Italics deleted.) The plaintiff insurer argues that this provision bars coverage in this case and that nothing in the *Hefner* decision changes this result. In its view, *Hefner* "was only concerned with the interpretation of the policy exclusion concerning 'this coverage[,]' and in no way does *Hefner* stand for the position that the policy exclusion concerning 'other insurance' is unclear

---

[6]The cases are *Interinsurance Exchange v. Alcivar* (1979) 95 Cal.App.3d 252 [156 Cal.Rptr. 914]; *Darrah v. California State Automobile Assn.* (1968) 259 Cal.App.2d 243 [66 Cal.Rptr. 374]; and *Kirby v. Ohio Cas. Ins. Co.* (1965) 232 Cal.App.2d 9 [42 Cal.Rptr. 509]. We note that, unlike the present case, in each of these cases finding the host car's insurance to be similar to the injured guest's, the limits were identical (i.e., the minimum).

or [ ]ambiguous. Regardless of the court's determination on the issue of ambiguity regarding 'this [coverage][,]' there can be no doubt that the meaning of 'other insurance' is crystal clear and beyond reasonable dispute. [¶] Insurance Code section 11580.2(c) allows an insurer the right to completely exclude UM coverage for an insured's injuries sustained by occupying any automobile other than the insured's owned automobile, if the owner of the vehicle had similar coverage." ■  Although we agree that Insurance Code section 11580.2, subdivision (c)(2), authorizes an insurer to exclude coverage if the owner of the other vehicle "has insurance similar to that provided in this section," we do not agree that the provision under review meets this statutory standard.

First of all, it is far from clear what this exclusion was intended to cover. Its phraseology is odd, stating the insurer "will not *provide insurance* for a vehicle." (Italics added.) After all, the uninsured motorist coverage promises to pay benefits to *insured persons* injured by an uninsured motorist; it does not promise to pay injuries connected with any particular vehicle. Does it mean that the insurer will not issue a policy under these circumstances? Or does it mean the same as the "Exclusions" exclusion, namely that "This coverage does not apply to bodily injury sustained by a person: . . . [¶] 4. If the injured person was occupying a vehicle you do not own which is insured for this coverage under another policy"? (Italics deleted.) If it indeed is intended to mean the same thing as the other exclusion, then it is subject to the same defect found in *Hefner*. If it means something different, then there is an irreconcilable conflict between the two clauses. In such a case, the provision that affords coverage—here the "Exclusions" exclusionary clause, as construed by *Hefner*—controls. (*Crane* v. *State Farm Fire & Cas. Co.* (1971) 5 Cal.3d 112, 115-116 [95 Cal.Rptr. 513, 485 P.2d 1129, 48 A.L.R.3d 1089]; *Tavares* v. *Glens Falls Ins. Co.* (1956) 143 Cal.App.2d 755, 761 [300 P.2d 102].)

Second, even if this other insurance clause could be read to mean that coverage is excluded unless the owner of the other vehicle "has no other insurance," it is still unclear whether such a provision could be squared with the statutorily authorized exemption. The statutory exemption applies when the other vehicle is covered by "insurance similar to that provided in this section" (Ins. Code, § 11580.2, subd. (c)(2)), not when the other vehicle has "no other [uninsured motorist] insurance." Under the contractual exclusion, the policy would not provide coverage even if the other vehicle were underinsured, so long as it had some uninsured motorist coverage. Such a construction would be at odds with the statutory scheme. It has been noted "that the insurance coverage provided for by section 11580.2 is a mandatory *minimum* uninsured motorist coverage which every policy must provide by

law. Thus, a policy which purports to provide a more restrictive coverage than that set forth in the statute will not be given effect." (*McKinney* v. *Farmers Ins. Exch.* (1973) 32 Cal.App.3d 947, 949 [108 Cal.Rptr. 581] [fn. deleted].) For these reasons, we conclude that this exclusion also cannot be read to exclude coverage under plaintiff's policy.

## III

This leaves the matter of the proper resolution of this appeal. The plaintiff was not suffering under any improper court-imposed limitations on its ability to introduce evidence, nor was its litigation theory erroneously based. We may consequently assume it marshalled the best case it could at trial. Under these circumstances, it is proper for us to direct that judgment be entered in favor of the defendant to avoid any additional expense. (Code Civ. Proc., § 43; *Burtis* v. *Universal Pictures Co., Inc.* (1953) 40 Cal.2d 823, 835 [256 P.2d 933]; *McCord* v. *Martin* (1920) 47 Cal.App. 717, 727 [191 P. 89]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 629, p. 610.) The parties have already stipulated to the proper proration of the applicable policies under Insurance Code section 11580.2, subdivision (d).

### DISPOSITION

The judgment is reversed and the cause remanded to the trial court with directions to enter a new and different judgment declaring that defendant Gardner is entitled to coverage under the uninsured motorist coverage contained in the plaintiff's policies issued to him. The plaintiff will be responsible on all damages up to $100,000 for 10/13 of indemnification. Defendant Gardner shall recover costs of appeal.

Puglia, P. J., and Blease, J., concurred.