Filed 7/27/21  S.T.I. Demolition v. Quarles CA2/1

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| S.T.I. DEMOLITION, INC., | B307978 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. TC022945) |
| v. | |
| CHARLES QUARLES, | |
| Defendant and Respondent. | |

APPEAL from an order of the Superior Court of Los Angeles County, Maurice A. Leiter, Judge.  Reversed.

Attlesey Storm, Keith A. Attlesey, John P. Ward, and Marc Thomas for Plaintiff and Appellant.

Law Offices of Michael Jay Berger and Michael Jay Berger for Defendant and Respondent.

———————————————

A judgment creditor challenges the trial court's denial of its postjudgment motion to add a party to the judgment pursuant to the alter ego doctrine. We conclude that the trial court did not apply the alter ego law correctly when it failed to consider all elements of that doctrine and all the relevant factors identified by our alter ego jurisprudence. We therefore remand the case for the trial court to evaluate the motion to amend the judgment in light of all the circumstances relevant to alter ego liability. If upon remand, the trial court concludes that the motion to add the party as an alter ego to the judgment is well-founded, then it must also consider the judgment debtor's laches defense.

## BACKGROUND

Appellant is S.T.I. Demolition, Inc. (STI), doing business as Full Scale Demolition, a construction company. Respondent is Charles Quarles (sometimes referred to as Quarles),[1] the former president and chief executive officer of The Bedford Group (Bedford), a corporation engaged in property development.

### 1. *Judgment*

In February 2011, after a bench trial, STI obtained a judgment against Bedford for $108,863.70. In its judgment renewal dated August 7, 2020, STI indicated Bedford owed it $212,571.58.

---

[1] We grant STI's motion to correct the identity of respondent. It is undisputed that Charles Quarles is the only respondent.

2

## 2. *Debtor's examination*

On August 21, 2019, STI filed an application and order for a debtor's examination. On September 26, 2019, John Ward, counsel for STI, examined Quarles as Bedford's representative. No reporter was present.

## 3. *STI moved to amend the judgment*

On June 3, 2020, STI filed a motion to amend the judgment to add Quarles as a judgment debtor. STI argued that Quarles was Bedford's alter ego.

In support of the motion, the president of STI, Ralph Rodriguez, averred that STI and Bedford entered into a written contract on an unspecified date. According to Rodriguez, Bedford failed to pay STI, and STI obtained a judgment against Bedford in February 2011. Rodriguez stated that Quarles appeared at trial. Rodriguez believed that Bedford continues to operate because it has a website and is registered with the California Secretary of State. Specifically, in May 2019, Bedford filed a statement of information with the Secretary of State signed by Quarles as Bedford's president.

Attorney Ward filed a declaration stating that Quarles appeared on behalf of Bedford at a debtor's examination that Ward conducted on September 26, 2019. According to Ward, Quarles testified that Quarles always owned 100 percent of Bedford's shares, and since 2012, Bedford has had no employees. Quarles told Ward that, in 2012, Bedford sold all of its assets and currently owns no assets and has no bank accounts. Ward averred that Quarles testified he continues to conduct business out of Bedford's offices and uses the following e-mail: cquarles@thebedfordgroup.com. Additionally, Bedford maintains

a website. Ward reported that Quarles testified Bedford is "essentially defunct" and Quarles did not shut it down because the website attracts customers to his consulting business and it would cost him $10,000 to "shut down Bedford and discharge its debts via bankruptcy."

According to Ward, Mr. Quarles stated that, at an unspecified date, Bedford prevailed in an arbitration against Zurich Insurance and obtained a $17 million arbitration award. "Mr. Quarles stated that he used $2,000,000 of the award to satisfy a debt owed to Hanmi Bank secured by his personal residence" on Kenway Drive (the Kenway Property). Ward reported that "Mr. Quarles stated Hanmi Bank agreed to sell the note to his nephew Darren Gooden so Mr. Quarles would not lose [the] Kenway [Property] to Hanmi." Ward explained that Quarles testified 40 percent of the arbitration award was used to pay Bedford's attorneys and an unspecified amount was used to pay City National Bank for a line of credit.

Documents attached to STI's motion to amend the judgment showed that in March 1998, Bedford conveyed the Kenway Property by grant deed to Charles and JoAnn Quarles. Charles Quarles signed the deed as president of Bedford. The deed states: " 'The grantors and the grantees in this conveyance are comprised of the same parties who continue to hold the same proportionate interest in in [*sic*] the property, R & T 11923(d).' " (Capitalization omitted.)

In 2006, Charles and JoAnn Quarles transferred a deed of trust on the Kenway Property to Hanmi Bank. In June 2012, Hanmi Bank filed a notice of default and election to sell indicating that Charles and JoAnn Quarles owed $16,509,082.58. On January 8, 2018, Hanmi Bank assigned the deed of trust to

4

the Gooden Group, Inc., whose managing director was Darren Gooden. It is undisputed that Darren Gooden is Quarles's nephew and was a former employee of Bedford.[2]

### 4. *Quarles's opposition*

Charles Quarles opposed STI's motion arguing, among other things, that Bedford's "payment to Hanmi Bank was a payment of a business debt because the bank required Mr. Quarles to collateralize his home in order to secure a $37 million construction loan from the bank to the Bedford Group." (Capitalization omitted.) Quarles also argued that the equitable doctrine of laches prevented STI from adding him as a judgment debtor.

In his declaration in opposition to STI's motion, Quarles stated he was the former president and former chief executive officer of Bedford. Bedford was involved in the construction of a condominium complex in Oakland, California (Oakland Property). Hanmi Bank entered into a construction agreement with Bedford and other entities to loan money to Thomas Berkley Square Housing, LLC for the construction of the Oakland Property. The loan was secured not only by the Oakland Property, but also by Charles and JoAnn Quarles's personal residence. According to Quarles, he signed a commercial guaranty of Hanmi Bank's loan to Thomas Berkley Square Housing, LLC for the construction of the Oakland Property secured by his personal residence.

Quarles averred that when Thomas Berkeley Square Housing, LLC defaulted on the loan, Hanmi Bank sold the

---

[2] STI's evidence indicated that Gooden was the former "Senior Director of Sales for The Bedford Group of Companies."

5

Oakland Property and commenced litigation against both Charles and JoAnn Quarles for the outstanding indebtedness. Hanmi bank agreed to postpone its trustee sale of the Kenway property, and on the day before the scheduled foreclosure sale, JoAnn Quarles filed for bankruptcy. According to Quarles, during the bankruptcy, Quarles reached a settlement agreement with Hanmi wherein it would be paid $1.2 million in satisfaction of its loan.

According to Quarles, Bedford obtained insurance proceeds from litigation concerning the Oakland Property "around" September 2014. Quarles "used the proceeds" from litigation against the insurer of the Oakland Property to pay the first $1 million of the latter settlement with Hanmi Bank. Quarles did not identify the recipients of the remaining insurance proceeds or dispute Ward's declaration that Bedford recovered $17 million from the insurer. According to Quarles, "I did not divert corporate funds for my own personal use. My payment to Hanmi Bank . . . was for a debt that was incurred for a business purpose. . . . While part of the debt was secured by . . . my home, I had to allow Lender [Hanmi Bank] to collateralize my home in order for the construction loan to be provided to the Bedford Group."

According to Quarles, Bedford ceased doing business in 2013. Quarles explained that he continued using the e-mail address "because that is the only e-mail address [he] ha[s] ever used." Bedford "still maintains a website because [Mr. Quarles] hope[s] that business may be revived again someday."

## 5.    *Trial court order*

In its written decision, the trial court concluded Quarles had control of the litigation between STI and Bedford resulting in

6

the 2011 judgment. The trial court reasoned: "Quarles owned the entirety of Bedford's shares. Quarles's control of Bedford during the underlying litigation means he dominated the entity and had control over the litigation; the element of virtual[ ] representation is satisfied."

The court then turned to whether Bedford and Quarles had a unity of interest, a prerequisite to establishing alter ego liability. "The principal issue here is whether Quarles diverted Bedford's money to pay personal debts, thereby comingling business and personal assets." The trial court stated that "the Hanmi loan was a business obligation in nature, even though it was placed on Quarles's personal residence." Based on the finding that the Hanmi loan was a business expense, the trial court concluded, "The evidence before the Court does not show Quarles commingled business and personal assets. The elements of alter-ego liability have not been established." The trial court then denied STI's motion to add Quarles as an additional defendant.

As set forth below, the alter ego doctrine requires evaluating a number of factors. The trial court did not do so, but instead, in analyzing whether there was a unity of interest between Bedford and Quarles, focused only on how to characterize the payment on the Hanmi Bank loan, which had been collateralized with Quarles's personal residence. The trial court made no findings as to whether applying the alter ego doctrine was in the interest of justice or as to Quarles's equitable laches defense.

## DISCUSSION

"The trial court is authorized to amend a judgment to add judgment debtors. [Citation.] The judgment may be amended to

add additional judgment debtors on the ground that a person or entity is the alter ego of the original judgment debtor.  [Citation.]  It is an equitable procedure based on the theory that the court is not amending the judgment to add a new defendant but is merely inserting the correct name of the real defendant." (*Relentless Air Racing, LLC v. Airborne Turbine Ltd. Partnership* (2013) 222 Cal.App.4th 811, 815 (*Relentless*); see also *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 508 (*Greenspan*).)

In general, a corporation is regarded as a separate legal entity.  (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora Diamond Corp.*).)  STI carries the burden to overcome the presumption of the separate existence of the corporate entity.  (*Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1212.)   " ' "[C]ourts will not permit themselves to be blinded or deceived by mere forms or law" ' " but must consider the requirements of justice.  (*Greenspan*, *supra*, 191 Cal.App.4th at p. 510; see also *Troyk v. Farmers Group, Inc.* (2009) 171 Cal.App.4th 1305, 1343 [" 'The essence of the alter ego doctrine is that justice be done.'  [Citation.]"].)

To prevail on a motion to add a judgment debtor as an alter ego of a corporation, STI must demonstrate that "(1) the parties to be added as judgment debtors had control of the underlying litigation and were virtually represented in that proceeding; (2) there is such a unity of interest and ownership that the separate personalities of the entity and the owners no longer exist; and (3) an inequitable result will follow if the acts are treated as those of the entity alone." (*Relentless*, *supra*, 222 Cal.App.4th at pp. 815–816.)  We discuss each element seriatim and then turn to respondent's laches argument.

8

## I. The Record Supports the Trial Court's Finding that Quarles Had Control of the Underlying Litigation and Was Virtually Represented in That Proceeding

The trial court found that Quarles had control of the underlying litigation. Quarles does not challenge that finding on appeal.

In any event, the evidence supports only the conclusion that Quarles was virtually represented in Bedford's litigation with STI. The undisputed evidence shows Quarles was Bedford's president, chief executive officer, and only shareholder. The undisputed evidence also shows that Quarles was present at trial. The record contains no evidence supporting the inference that Quarles did not control the underlying litigation.

## II. The Trial Court Must Determine Whether There is Such a Unity of Interest and Ownership that Bedford and Quarles's Separate Personalities No Longer Exist

Our jurisprudence has identified several factors a trial court must consider in deciding whether a corporation and an individual are alter egos. These factors include: "Commingling of funds and other assets, failure to segregate funds of the separate entities, and the unauthorized diversion of corporate funds or assets to other than corporate uses [citations]; the treatment by an individual of the assets of the corporation as his own [citations]; the failure to obtain authority to issue stock or to subscribe to or issue the same [citations]; the holding out by an individual that he is personally liable for the debts of the corporation [citations]; the failure to maintain minutes or adequate corporate records, and the confusion of the records of

9

the separate entities [citations]; the identical equitable ownership in the two entities; the identification of the equitable owners thereof with the domination and control of the two entities; identification of the directors and officers of the two entities in the responsible supervision and management; sole ownership of all of the stock in a corporation by one individual or the members of a family [citations]; the use of the same office or business location; the employment of the same employees and/or attorney [citations]; the failure to adequately capitalize a corporation; the total absence of corporate assets, and undercapitalization [citations]; the use of a corporation as a mere shell, instrumentality or conduit for a single venture or the business of an individual or another corporation [citations]; the concealment and misrepresentation of the identity of the responsible ownership, management and financial interest, or concealment of personal business activities [citations]; the disregard of legal formalities and the failure to maintain arm's length relationships among related entities [citations]; the use of the corporate entity to procure labor, services or merchandise for another person or entity [citations]; the diversion of assets from a corporation by or to a stockholder or other person or entity, to the detriment of creditors, or the manipulation of assets and liabilities between entities so as to concentrate the assets in one and the liabilities in another [citations]; the contracting with another with intent to avoid performance by use of a corporate entity as a shield against personal liability, or the use of a corporation as a subterfuge of illegal transactions [citations]; and the formation and use of a corporation to transfer to it the existing liability of another person or entity [citations]." (*Associated Vendors, Inc. v. Oakland*

*Meat Co., Inc.* (1962) 210 Cal.App.2d 825, 838–840; see also *Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1073 (*Misik*).)

No single factor governs; instead, a trial court must "look at all the circumstances" in applying the alter ego doctrine. (*Sonora Diamond Corp., supra*, 83 Cal.App.4th at p. 539.) We review the trial court's factual findings underlying an alter ego determination for substantial evidence. (*Baize v. Eastridge Companies, LLC* (2006) 142 Cal.App.4th 293, 303.) We review questions of law independently. (*Crocker National Bank v. City and County of San Francisco* (1989) 49 Cal.3d 881, 888.)

Here, the trial court considered only whether Bedford's payment to Hanmi Bank from the Zurich Insurance proceeds constituted commingling of business and personal funds. As we explain below, substantial evidence supports the trial court's finding that the Hanmi Bank payment was for a Bedford debt and not a debt personal to Quarles, and thus did not, by itself, evidence commingling. As we also explain, the trial court committed legal error in failing to consider the totality of circumstances when it concluded that there was no unity of interest between Bedford and Charles Quarles.

> **a. Substantial evidence supported the conclusion that the Hanmi loan payment was for a Bedford debt notwithstanding Quarles's guarantee of that loan and posting of the family residence as collateral for that debt**

It is undisputed that Hanmi Bank loaned money to Thomas Berkley Square Housing, LLC for the construction of the Oakland Property, one of Bedford's construction projects. Hanmi Bank did not loan Charles or JoAnn Quarles money personally. Bedford paid off its own debt when it paid either $1 million or

11

$2 million to Hanmi Bank.[3]  Charles Quarles averred that he signed a commercial guaranty.  As a guarantor, he was answering for Bedford's debt.  (Civ. Code, § 2787 ["A surety or guarantor is one who promises to answer for the debt, default, or miscarriage of another, or hypothecates property as security therefor."].)  Although STI correctly points out that the payment from the Zurich settlement proceeds to Hanmi Bank unencumbered equity in the Quarles's residence, that encumbrance was a product of Bedford's debt.  Viewed through the substantial evidence lens, Bedford's payment to Hanmi Bank constituted payment for Bedford's debt, and by itself, does not establish commingling of Bedford's and Quarles's funds just because the Quarles residence served as part of the collateral for Hanmi Bank's loan to Bedford.  (*San Diegans for Open Government v. City of San Diego* (2016) 245 Cal.App.4th 736, 740 [under substantial evidence test, appellate court must view the evidence in the light most favorable to the trial court's order].)

> **b.    The trial court, however, failed to consider all mandated factors when it determined there was no unity of interest between Bedford and Quarles**

A trial court must consider many factors in evaluating an alter ego claim.  In his respondent's brief, Quarles acknowledges the following relevant factors:  " 'the disregard of legal formalities and the failure to maintain arm's length relationships among

---

[3] STI argues that the trial court failed to determine whether Bedford paid $1 million or $2 million to Hanmi Bank. The nature of the payment—whether it was for a business or personal debt—is not dependent on whether the amount of the payment was $1 million or $2 million.

related entities,' 'the failure to maintain minutes or adequate corporate records,' 'the confusion of the records of the separate entities,' the 'failure to segregate funds of the separate entities,' '[c]ommingling of funds and other assets,' . . . 'sole ownership of all of the stock in a corporation by one individual or the members of a family' . . . 'the use of the same office or business location,' . . . 'the unauthorized diversion of corporate funds or assets to other than corporate uses . . . .'" Quarles also correctly points out "no single factor is determinative . . . ." (*Highland Springs Conference & Training Center v. City of Banning* (2016) 244 Cal.App.4th 267, 281 ["No single factor governs; courts must consider all of the circumstances of the case in determining whether it would be equitable to impose alter ego liability."].)

Here, the trial court considered only one transaction—the Hanmi Bank loan—as relevant to commingling. The trial court failed to evaluate "all the circumstances"[4] encompassed in the

---

[4] These circumstances include, but are not limited to, the following facts: Quarles in his capacity as president of Bedford transferred the Kenway property to Charles and JoAnn Quarles representing that Bedford and the Quarles's were the "same parties." (Capitalization omitted.) Hanmi Bank assigned the deed of trust on the Kenway Property to the Gooden Group, Inc., whose managing director was Darren Gooden, a former employee of Bedford and Quarles's nephew. Although Bedford has stopped conducting business in 2013, Bedford maintains offices, a website, and an e-mail address. Quarles operates his consulting business in the same offices. Bedford received $17 million in insurance proceeds in 2014 after Bedford "went out of business." In 2019, Quarles continued to represent to the California Secretary of State that he was Bedford's "president." (Capitalization omitted.) According to Quarles, his current use of Bedford's website benefits Quarles's consulting business. By

above-described factors.  We thus must remand this matter for the trial court to consider, based on the totality of circumstances, whether there is such a unity of interest and ownership between Bedford and Quarles that their separate personalities no longer exist.  (See *Misik*, *supra*, 197 Cal.App.4th at p. 1075 [where trial court applied incorrect law to deny motion to amend based on alter ego, appellate court reversed and remanded for trial court to make factual determinations].)

## III. The Trial Court Did Not Determine Whether an Inequitable Result Would Follow if Bedford and Quarles Were Treated as Separate Entities

On appeal, the parties dispute whether an inequitable result would follow if Bedford and Quarles were treated as separate entities.  Based on its conclusion that there was no unity of interest between Bedford and Quarles, the trial court did not consider this additional element of alter ego liability.  We decline the parties' invitation to make any such finding in the first instance on appeal.  (*Stark v. Coker* (1942) 20 Cal.2d 839, 846 [alter ego is an equitable doctrine and is particularly within the province of the trial court]; see *People v. Orabuena* (2004) 116 Cal.App.4th 84, 100 [appellate court cannot substitute its discretion for the discretion of the trial court].)  Upon remand, if the trial court determines that there is such a unity of interest and ownership that the separate personalities of Bedford and Quarles no longer exist, it must then consider the final element of

setting forth these facts, we express no opinion on how the trial court should rule on the unity of interest element of the alter ego analysis.

14

alter ego liability—whether an inequitable result would follow if Quarles were not added to the judgment as Bedford's alter ego.

## IV.    Laches

The parties dispute whether the laches doctrine applies to this case. " ' "Laches is an equitable defense based on the principle that those who neglect their rights may be barred from obtaining relief in equity. [Citation.]" ' " (*Golden Gate Water Ski Club v. County of Contra Costa* (2008) 165 Cal.App.4th 249, 263.) "The existence of laches is a question of fact to be determined by a weighing of all of the applicable circumstances by the trial judge." (*Rouse v. Underwood* (1966) 242 Cal.App.2d 316, 323.) The trial court did not consider Quarles's laches defense apparently because it concluded there was no unity of interest between Bedford and Quarles with which to pierce Bedford's corporate veil. If, upon remand, the trial court concludes that Quarles and Bedford are alter egos, then the court must evaluate Quarles's laches defense.[5]

---

[5] Quarles argues inter alia that the near 10-year passage of time since STI obtained its judgment against Bedford has prejudiced Quarles in defending against STI's alter ego claim because Bedford's books and records have been destroyed and its accountant is deceased. STI disputes these claims and argues that laches does not apply.

## DISPOSITION

The order denying S.T.I. Demolition, Inc. (STI)'s motion to add a judgment debtor is reversed.  The case is remanded to the trial court for additional proceedings consistent with this opinion. STI is awarded its costs on appeal.

<u>NOT TO BE PUBLISHED.</u>

BENDIX, Acting P. J.

We concur:

CHANEY, J.

CRANDALL, J.*

---

&ast;  Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.