[No. B138295. Second Dist., Div. Four. Apr. 24, 2001.]

LIBERTY MUTUAL FIRE INSURANCE COMPANY, Plaintiff,
Cross-defendant and Respondent, v.
MICHAEL McKENZIE, Defendant, Cross-complainant and Appellant.

## Counsel

Richard I. Wideman for Defendant, Cross-complainant and Appellant.

Kern and Wooley, Ronald J. Skocypec and Ilya A. Kostenboym for Plaintiff, Cross-defendant and Respondent.

## Opinion

**VOGEL (C. S.), P. J.—**

### Introduction

The primary issue raised on this appeal is one of insurance coverage. Liberty Mutual Fire Insurance Company (Liberty) issued two policies to Michael McKenzie (McKenzie). Each required that the insured own the covered vehicle. Neither policy defined "owned." McKenzie submitted claims on each policy based upon the theft of his truck. It is undisputed that the stolen vehicle was designated as the insured vehicle and that McKenzie had paid the policies' premiums. It is also undisputed that Liberty subsequently learned that a month before the theft, McKenzie had filed a transfer of title document with the Department of Motor Vehicles (DMV) ostensibly transferring title of the insured vehicle to his already deceased father. After filing that transfer document, McKenzie retained use and possession of the vehicle. (See fn. 6, *post.*)

Liberty filed a declaratory relief action to determine coverage and to recapture money already paid to McKenzie. The nub of Liberty's position was that because McKenzie had "transferred" title to his deceased father, he (McKenzie) no longer owned the vehicle within the meaning of the policies

and therefore was not entitled to coverage. McKenzie filed a cross-complaint for breach of contract and breach of the implied covenant of good faith and fair dealing. The trial court ultimately entered summary judgment in favor of Liberty on both pleadings.

McKenzie's appeal primarily challenges the grant of summary judgment. We first find the trial court erred when it concluded McKenzie no longer possessed an insurable interest in the vehicle because of his purported transfer of title to his deceased father. This conclusion was error because an inter vivos transfer to a dead person cannot and does not transfer title. In light of that legal conclusion and the other relevant facts (neither policy defined "owned," the stolen truck was the insured vehicle, McKenzie had paid the required premiums, and McKenzie retained exclusive possession of the truck and continued to use it after he "transferred" title to his father), we agree with McKenzie that a triable issue of material fact exists as to whether he was entitled to coverage. We therefore reverse the grant of summary judgment.

Second, McKenzie's appeal challenges a $2,574 sanctions award imposed on him and his attorney during the pretrial litigation pursuant to Code of Civil Procedure section 128.7. The court imposed sanctions because McKenzie, in contravention of well-settled law, had named a claims adjuster employed by Liberty as a cross-defendant in his cross-complaint. McKenzie claims the award was improper because he had dismissed the claims adjuster from the pleading within the safe harbor provision of the statute. We find no merit to the claim because McKenzie failed to give timely notice of the dismissal to Liberty. We therefore affirm the sanctions order.

FACTUAL AND PROCEDURAL BACKGROUND

As gleaned from the evidence produced during the defense motions for summary adjudication of issues and summary judgment, the pertinent facts are undisputed and are the following.

For several years prior to 1995, McKenzie worked as a distributor for Mac Tools, Inc., selling tools to automotive and truck mechanics within a geographic location designated by Mac Tools, Inc. McKenzie purchased the tools from Mac Tools, Inc. and resold them to his customers.

McKenzie submitted a claim based on the December 21, 1995 theft of his truck. The truck, which contained an inventory of tools, had been stolen from a restaurant parking lot. The police subsequently recovered the truck in

damaged condition, but without any tools inside of it.[1] At issue is whether McKenzie was afforded coverage for that loss pursuant to two policies issued by Liberty.

The named insured on each policy is "The Distributors of Mac Tools." One is a business auto policy that includes comprehensive coverage. Coverage is expressly limited to "owned autos only." The second is an Inland Marine Cargo Insurance policy which covered the loss of "tools and associated inventory . . . only while contained in [a vehicle] owned or leased . . . by the Insured's distributors . . . ." Neither policy explicitly equates ownership with being the registered owner. In fact, neither policy offers any definition of "ownership."

After McKenzie (who was current in payment of premiums) presented his claims, Liberty paid him in January 1996 $5,521.56 for property damage to the truck.

Thereafter, Liberty learned that McKenzie was not the record owner of the truck at the time of theft. Certified copies of DMV documents established that on November 16, 1995 (more than a month before the theft), McKenzie had transferred title to the vehicle to his father, Frank McKenzie. McKenzie had forged his father's signature on the "Application for Transfer by New Owner" because his father had long since died. McKenzie later explained: "Due to my own fear of repercussions of me not filing income tax returns for some time, in November 16, 1995, I changed the registered owner of my truck to the name of my dead father, Frank McKenzie." The official DMV registration issued on December 14, 1995, listed Frank McKenzie as the registered owner, effective November 16, 1995.

In addition, Liberty learned that several weeks before the theft, McKenzie had "put the truck in the name of John McKenzie," his brother, who, like his father, was dead. McKenzie explained he had done so "to protect [his] assets" because he had been sued in a personal injury action. When McKenzie first reported the theft to the police, he told them his brother was the registered owner of the truck and gave his own address as his deceased brother's address.

As noted earlier, Liberty, after learning McKenzie had ostensibly transferred title to the insured vehicle before the loss had occurred, filed a declaratory relief action to determine coverage under the two policies and to

---

[1]Liberty, both in the trial court and on this appeal, has strongly suggested that McKenzie fabricated the claim his truck was stolen. This issue was neither presented to nor ruled upon by the trial court. We therefore disregard Liberty's insinuations along that line.

recapture the money paid to McKenzie. McKenzie filed a cross-complaint against Liberty for breach of contract and breach of the implied covenant of good faith and fair dealing. In the cross-complaint, McKenzie also named as a cross-defendant Michael Banfield, whom he described as Liberty's "technical claims specialist."

Liberty eventually moved for summary adjudication on its declaratory relief action and summary judgment on McKenzie's cross-complaint. Following lengthy litigation, the procedural details of which are not pertinent to this appeal, the trial court entered judgment in favor of Liberty.

The court found:

"There is no dispute that McKenzie purchased the vehicle; originally held title to the vehicle; and then transferred title to the vehicle to his deceased father after he renewed the policies in question. In fact, the record further discloses that as of July 8, 1996 [seven months after the theft], McKenzie stated in a DMV SRI form that the owner of the vehicle was Frank McKenzie.

"Additionally, there is no evidence to support an indicia of ownership by McKenzie other than use of the vehicle. There is no UCC-1 establishing a security interest, and no documents to establish:

"(1)  Title;

"(2)  Lienholder interest; and/or

"(3)  Equitable title or interest of any kind.

"Moreover, there have been no cases presented to this Court which establish any ownership interest in an individual who first purchased a vehicle and took title attendant to that purchase and then transfers title and registered ownership status and yet somehow claims co-ownership to the vehicle without any documentation whatsoever.

"Summary judgment is hereby granted based on the argument that McKenzie has no standing to sue [Liberty] because he had no insurable interest in the vehicle or its contents. Without an insurable interest, McKenzie cannot pursue his cross-complaint for breach of contract and breach of the implied covenant of good faith and fair dealing. [¶] . . . [¶]

"McKenzie's lack of ownership in the vehicle also precludes recovery for the contents of the vehicle. . . . [T]he cargo policy provides that it only

covers inventory while contained in the truck owned or leased by the insured's distributors."

In regard to Liberty's action against McKenzie, the court found McKenzie had breached contractual obligations imposed by the insurance policies by misrepresenting to Liberty his ownership interest in the stolen truck; that Liberty was entitled to rescind the policies because of McKenzie's material misrepresentations and concealments; and that Liberty was entitled to restitution of the $5,521.26 it had paid to McKenzie.

In regard to McKenzie's cross-complaint against Liberty, the court found McKenzie's claims for breach of contract and breach of the implied covenant of good faith and fair dealing had no merit as a matter of law because neither McKenzie's truck nor its contents were insured by Liberty.

Lastly, the court imposed $2,574 in sanctions against McKenzie and his attorney Richard I. Wideman because the cross-complaint had improperly included Banfield as a cross-defendant. (The facts leading to that ruling will be discussed later.) This appeal by McKenzie follows.

## DISCUSSION

### A. *The Court Erroneously Granted Summary Judgment in Favor of Liberty*

McKenzie contends the court's rulings were incorrect because triable issues of material fact exist. In particular, he claims a triable issue of fact exists as to whether he "owned" the vehicle, thereby entitling him to coverage under the policies. Given the unusual factual matrix of this case, we agree.

The lynchpin of the trial court's ruling (as well as Liberty's denial of coverage) is the belief that McKenzie's November 1995 "transfer" of title to his dead father conclusively divested McKenzie of any ownership interest in the vehicle at the time the alleged loss occurred. This belief implicitly assumes that McKenzie's execution and filing of the documents with the DMV resulted in an actual transfer of title. Not so.

Case law makes clear that DMV records are not conclusive on the issue of ownership. When warranted by the specific facts, the court will look "behind" the transfer to see who, in fact, is the true owner. This is such a case. (See, e.g., *In re Marriage of Finnell* (1986) 182 Cal.App.3d 52 [227 Cal.Rptr. 38] [DMV records not conclusive in regard to claim of a third

party judgment creditor]; *Gates v. Levers* (1951) 108 Cal.App.2d 131 [238 P.2d 143] [equity recognizes the true owner over the record title owner if the circumstances require that result; purchaser of a house trailer who paid for, lived in, and had exclusive possession of the trailer was permitted to seek rescission of the sales contract based upon a claim of fraud even though DMV records indicated his sister was the trailer's registered owner].)

Because it is undisputed that McKenzie's father died well before the transfer, the transfer could not and did not have any legal effect. "[I]n the case of an inter vivos donative document of transfer, the death of the named beneficiary before the effective date of the inter vivos donative document of transfer causes the gift to fail."[2] (Rest.2d Property, Donative Transfers (1992) § 34.6, com. b, p. 292.) In other words, a dead person cannot be the recipient of an inter vivos transfer of title to property. Liberty offers no legal authority to the contrary. Consequently, while McKenzie's intent to hide an asset from creditors was clearly improper, there was no *real* transfer of title in the sense that someone other than McKenzie now conclusively owned the vehicle. That is, McKenzie's wrongful intent does not necessarily mean that Liberty can avoid its contractual obligations if McKenzie otherwise remained the owner of the vehicle within the meaning of the two policies.[3] As noted, neither policy either defines "owner" as the individual who is on record with the DMV as holding title[4] or offers any definition of "owned."

Liberty's reliance on statutory and decisional law to support the claim that record title equates with ownership is unavailing *in this context*. It is true those authorities define "owner" as the holder of record legal title.[5] However, that principle does *not* resolve this case because it presupposes a valid

---

[2]A similar rule applies to testamentary transfers. If the devisee dies before the testator, the gift fails in that title does *not* pass to the deceased devisee. (12 Witkin, Summary of Cal. Law (9th ed. 1990) Wills and Probate, § 323, pp. 357-359.)

[3]In some instances, the defense of "unclean hands" can be raised in an action at law. (See, e.g., *Unilogic, Inc. v. Burroughs Corp.* (1992) 10 Cal.App.4th 612, 618-621 [12 Cal.Rptr.2d 741], and cases cited therein.) However, we need not decide whether that defense is applicable to this fact pattern because Liberty did not raise it in the trial court.

[4]McKenzie's declaration averred: "I was never told that I had to be the registered owner of my truck to be covered. In fact, at no time did any of the many records relating to the insurance . . . ask for the name of the registered 'owner' of the truck." McKenzie attached three such documents to his declaration.

[5]Vehicle Code section 460 states: "An 'owner' is a person having all the incidents of ownership, including the legal title of a vehicle whether or not such person lends, rents, or creates a security interest in the vehicle . . . ."

In factual settings not relevant to this case, decisional law has adopted a similar definition. " '[T]he word "owner," as applied to motor vehicles, is commonly understood to designate the person in whom title is vested either as legal owner or as registered owner.' [Citation.]" (*Government Employees Ins. Co. v. Superior Court* (2000) 79 Cal.App.4th 95, 102 [93 Cal.Rptr.2d 820] [insurance policy provision permits insurer to settle a claim with either the

registration or transfer of title, something which did not occur here. The real issue is whether McKenzie owned the vehicle *notwithstanding* that "transfer." Other sources of law provide direction in determining that dispute. For instance, Civil Code section 654 states: *"The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others.* In this Code, the thing of which there may be ownership is called property." (Italics added.) And Black's Law Dictionary (7th ed. 1999) page 1130, defines "own" as: *"To have or possess as property*; to have legal title to." (Italics added.) Regarding both of these definitions, it is relevant that McKenzie's declaration averred that even after he registered the truck in his father's name, he retained exclusive use and possession of it.[6]

In order to recover on an insurance policy, an individual must have "[a]n insurable interest in the property insured. [Citations.] . . . An interest in the property insured must exist when the insurance takes effect and when the loss occurs. [Citations.]" (*International Service Ins. Co. v. Gonzales* (1987) 194 Cal.App.3d 110, 117-118 [239 Cal.Rptr. 341].) The predicate of an insurable interest in each Liberty policy is that the insured (McKenzie) owned the vehicle. Because " '[o]wnership' has different meanings, depending on the context in which the word appears and the circumstances in which it is used. [Citations.]" (*Bohannon v. Aetna Casualty & Surety Co.* (1985) 166 Cal.App.3d 1172, 1175 [212 Cal.Rptr. 848]), a triable issue of material fact exists in this case as to whether McKenzie owned the vehicle and therefore was entitled to coverage under either of the two policies. It therefore follows that the court erred in granting summary judgment to Liberty on its complaint for declaratory relief in regard to coverage and on McKenzie's cross-complaint for breach of contract and breach of the implied covenant of good faith and fair dealing.

### B. *The Trial Court Properly Awarded Sanctions to Liberty*

*Factual Background*

■ As noted earlier, McKenzie's cross-complaint against Liberty for breach of contract and breach of the implied covenant of good faith also

---

insured or the owner; insurer reasonable in relying upon DMV records to settle with recorded title owner]; see also *Mid-Century Ins. Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1211-1212 [11 Cal.Rptr.2d 918] ["[H]olding the title of record [to a motor vehicle] . . . is certainly ownership in its most ordinary sense . . . ."].)

[6]His declaration averred: "At all times herein relevant and on December 21, 1995 and before and after that date, I was the owner of the 1986 Chevy 16 foot Curbmaster Truck that was stolen on December 21, 1995 and in which my tools were located. [¶] I had exclusive possession of the truck. I bought it; I owed nothing 'on' it. I used the truck daily, with Mac Tools' knowledge, in my business."

named as a cross-defendant a Liberty claims handler, Michael Banfield. On this appeal, McKenzie does not dispute that as a matter of law an insurance employee such as Banfield cannot be sued for either breach of contract or breach of the implied covenant of good faith. (See, e.g., *Austero v. National Cas. Co.* (1976) 62 Cal.App.3d 511, 515 [133 Cal.Rptr. 107]; *Iversen v. Superior Court* (1976) 57 Cal.App.3d 168, 172 [127 Cal.Rptr. 49].)

McKenzie filed his cross-complaint in November 1996, including Banfield as a cross-defendant. McKenzie never served Banfield with the cross-complaint.

In June 1997, Liberty, by letter, requested McKenzie to delete Banfield from the cross-complaint. The request was supported by citation of proper authorities. In July 1997, Liberty filed an order to show cause to dismiss Banfield and for imposition of sanctions.

The court issued an order to show cause and set a hearing for November 26, 1997.

On October 21, 1997, Liberty served McKenzie's attorney "with a motion, pursuant to Code of Civil Procedure Section 128.7, [for] additional sanctions . . . in the event you fail to dismiss the cross-complaint against Michael Banfield within 30 days of the service of the motion . . . ." Liberty explained that if counsel did not dismiss the cross-complaint within the 30 days, Liberty "will file the motion [for additional sanctions] and it will be heard by the Court on November 26, 1997. However, Liberty reserves the right to file its motion even in the event you dismiss Mr. Banfield within the 30-day period. In that event, argument will be limited to the issue of monetary sanctions."

On November 17, 1997, McKenzie dismissed Banfield without prejudice from his cross-complaint. A declaration from McKenzie's attorney explained the dismissal was without prejudice because "[w]hen and if" he obtained discovery to support a claim Banfield had conspired with Liberty and Mac Tools, Inc., he "expect[ed] to re-name him and to serve him with the cross-complaint . . . ." McKenzie did not notify Liberty that he had dismissed Banfield from the cross-complaint.

On November 21, 1997, Liberty filed with the court its motion for sanctions against McKenzie and his counsel.

On December 1, 1997, the court heard the matter. If that hearing was reported, McKenzie has not included a transcript of it in the record on appeal. The court's written ruling provides, in pertinent part:

"As to [Liberty's] motion for sanctions pursuant to CCP § 128.7, as it relates to the naming of Michael Banfield as a cross-defendant by McKenzie, the Court now rules as follows:

"(1)   [Liberty's] motion for sanctions is granted;

"(2)   The Court finds that the cross-complaint as against Michael Banfield is without merit for the reasons and points and authorities set forth in the moving papers[;]

"(3)   Reimbursement in the amount of $2,574.00 is to be paid to Michael Banfield's counsel, the law firm of Kern & Wooley, and is assessed against Michael McKenzie and Richard Wideman, jointly and severally, pursuant to CCP § 128.7. The monies are to be paid within 30 days of this order.

"It is further noted that counsel for McKenzie, Richard Wideman, Esq., filed a request for dismissal (without prejudice) as to cross-defendant Michael Banfield on November 17, 1997. There was no proof of service as to this dismissal and [Liberty] had no notice of the dismissal until November 25, 1997. The dismissal of the cross-defendant Banfield was filed after the Court had set an OSC re: dismissal and just days before [Liberty's] hearing on the CCP § 128.7 request for sanctions."[7]

*Discussion*

McKenzie contends the sanctions award must be reversed because he complied with Liberty's request within the statute's "30-day safe harbor provision." He relies upon the fact that Liberty served him with its motion on October 21 and that he dismissed Banfield on November 17, less than 30 days later. He therefore contends the trial court lacked jurisdiction to impose the sanctions. We are not persuaded.

McKenzie's briefs do not controvert the trial court's finding that he did not serve Liberty with notice of Banfield's dismissal and that Liberty did not learn of the dismissal until November 25, more than 30 days after it had served him with its motion requesting Banfield's dismissal, four days after it

---

[7]Seven months earlier, the court had imposed sanctions because McKenzie had included Liberty's attorney (Robinson) as a cross-defendant. Liberty had quickly brought to the attention of McKenzie's counsel that naming counsel as a codefendant was improper as a matter of law. McKenzie's attorney refused to delete Robinson, forcing Liberty to file a demurrer on that basis, a pleading which the trial court granted. In May 1997, the court found "the severest of sanctions are necessary to deter this frivolous claim which has been pursued for an improper purpose" and imposed $4,414 in sanctions. McKenzie does not challenge that sanctions award.

had served the court with its sanctions motion, and a mere one day before the scheduled hearing.[8] Given that chronology, we believe the trial court still possessed jurisdiction to impose sanctions.

"The purpose of the safe harbor provisions is to permit an offending party to avoid sanctions by withdrawing the improper pleading during the safe harbor period. [Citation.] This permits a party to withdraw a questionable pleading without penalty, *thus saving the court and the parties time and money litigating the pleading as well as the sanctions request*." (*Malovec v. Hamrell* (1999) 70 Cal.App.4th 434, 441 [82 Cal.Rptr.2d 712], italics added.)

It therefore follows that to avoid the award of sanctions sought pursuant to Code of Civil Procedure section 128.7, it is not sufficient for the offending party to simply take action to correct or withdraw the challenged pleading (e.g., to dismiss Banfield from the cross-complaint). The offending party must also give notice to the moving party that it has taken that step. Absent that notice, the moving party has no knowledge that the problem has been resolved and consequently it will proceed (as it had warned the offending party it would do) with filing the sanctions motion with the court. This requires the unnecessary expenditure of attorney and court time which could have simply been avoided had notice been given. Because McKenzie did not take that step (and has offered no explanation for that omission), we conclude the court had authority to impose the sanctions requested.

### DISPOSITION

The summary judgment entered on December 7, 1999, is reversed. The sanctions order entered on December 9, 1997, is affirmed. The parties to bear their own costs on appeal.

Epstein, J., and Hastings, J., concurred.

A petition for a rehearing was denied May 23, 2001, and respondent's petition for review by the Supreme Court was denied July 18, 2001.

---

[8] At oral argument, McKenzie for the first time cited one page from the voluminous record to support the claim that he *did* give Liberty notice of the dismissal before November 25, 1997. We have reviewed that page. It consists solely of a self-serving and uncorroborated declaration from McKenzie's counsel offered in the context of a discovery dispute. Nothing in it undermines the trial court's finding, set forth in its minute order, that Liberty had no notice of the dismissal until November 25, 1997.