**UNITED STATES of America,**
**Plaintiff,**

v.

**Lee Vaughn WALKER,**
**et al., Defendants.**

**No. 08–CR–0256–L.**

United States District Court,
S.D. California.

March 25, 2009.

Andrew G. Schopler, U.S. Attorney's Office Southern District of California, San Diego, CA, for U.S.

Richard M. Barnett, Law Offices of Richard M. Barnett, San Diego, CA, for Virginia Hughes.

## ORDER ON PETITION OF VIRGINIA HUGHES TO ADJUDICATE VALIDITY OF PETITIONER'S INTEREST IN FORFEITED PROPERTY

M. JAMES LORENZ, District Judge.

On December 9, 2008, Petitioner Virginia Hughes ("Petitioner"), petitioned the Court for a hearing to adjudicate the validity of her interest in a vehicle that was forfeited to the United States pursuant to 21 U.S.C. § 853. As outlined below, Petitioner has failed to meet her burden for setting aside the forfeiture order. Accordingly, her petition to recover the forfeited property is **DENIED.**

### I. Procedural Background

On January 30, 2008, an indictment was returned against thirteen defendants, charging conspiracy to distribute crack cocaine and methamphetamine. The indictment included forfeiture allegations relating to several vehicles and various amounts of U.S. currency. The instant petition relates to one of the vehicles, a 1998 Chevy Tahoe V8, bearing California License plate number 3XSH296 and VIN 1GNEK13R3WJ333366 (the "Chevy Tahoe"). The indictment alleges the Chevy Tahoe was driven by defendant Lee Vaughn Walker ("Walker") and was used in the commission of the offenses. Petitioner is Walker's mother.

On October 16, 2008, co-defendant Daphne Rosalinda Jackson pled guilty to Count I of the indictment (Conspiracy to Distribute Crack Cocaine). As part of her plea, she consented to the forfeiture allegations of the Indictment, including the forfeiture of the Chevy Tahoe. On October 24, 2008, the Court entered a Preliminary Order of Criminal Forfeiture ("POF") forfeiting the Chevy Tahoe to the United States.[1]

On December 9, 2008, Petitioner filed the instant petition pursuant to 21 U.S.C. § 853(n) and Federal Rule of Criminal Procedure 32.2 asking the Court to adjudicate her interest in the Chevy Tahoe. She claims that she is the owner of the vehicle.

---

1. The October 24, 2008 POF based on Jackson's plea triggered Petitioner's right to file the instant Petition. *See* 21 U.S.C. § 853(k); (n)(1)-(2). Subsequently, Walker also pled guilty. On January 9, 2009, Walker pled guilty to Count I of the Superceding Information (Conspiracy to Distribute Crack Cocaine). In his plea, he consented to the forfeiture of the Chevy Tahoe.

On January 22, 2009, the Court held a hearing on Petitioner's claim. Both Petitioner and the Government presented testimony and evidence. After the conclusion of the hearing, the Court requested supplemental briefing and took the matter under submission.

## II. Legal Standard

■ Under 21 U.S.C. § 853, the United States is entitled to forfeiture of any property constituting or derived from the proceeds of certain illegal drug transactions, or any property used to commit the illegal activity. 21 U.S.C. § 853(a). However, because § 853 acts *in personam*, "it permits the forfeiture of the defendant's interests only, not the property of innocent parties." *United States v. Nava*, 404 F.3d 1119, 1124 (9th Cir.2005).

■ The procedure for innocent third parties to assert their interests in forfeited property is provided in § 853(n). To successfully set aside the forfeiture of the Chevy Tahoe, Petitioner must show, by a preponderance of the evidence, that she:

> has a legal right, title, or interest in the property, and such right, title, or interest renders the order of forfeiture invalid in whole or in part because the right, title, or interest was vested in the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant *at the time of the commission of the acts which gave rise to the forfeiture* of the property under this section.

21 U.S.C. § 853(n)(6)(A) (emphasis added). The temporal requirement "at the time of the commission of the acts which gave rise to the forfeiture" applies to both "vested in the petitioner rather than the defendant" and the alternative "or was superior to any right, title, or interest of the defendant." *United States v. Hooper*, 229 F.3d 818, 821 (9th Cir.2000). Therefore, to qualify for relief under § 853(n)(6)(A), Petitioner's legal interest must have been vested in her at the time her son committed his crimes. *Id.*

■ "Under 21 U.S.C. § 853(n)(6) the 'legal right, title or interest' of the third party is determined by state law." *U.S. v. Alcaraz–Garcia*, 79 F.3d 769, 774 (9th Cir. 1996). *See also United States v. Lester*, 85 F.3d 1409, 1412 (9th Cir.1996) ("In drug forfeiture actions, ownership of property is determined by state law."); *Hooper*, 229 F.3d at 820 ("State law determines whether Claimants have a property interest, but federal law determines whether or not that interest can be forfeited.").

■ Under California law, "[t]he records of the DMV do not necessarily and conclusively establish the true ownership of a vehicle. A certificate of ownership is evidence of title, although not conclusive on the subject." *People v. Clifton*, 171 Cal.App.3d 195, 200, 217 Cal.Rptr. 192 (1985). *See also Liberty Mut. Fire Ins. Co. v. McKenzie*, 88 Cal.App.4th 681, 687–688, 105 Cal.Rptr.2d 910 (2001) ("Case law makes clear that DMV records are not conclusive on the issue of ownership. When warranted by the specific facts, the court will look 'behind' the transfer to see who, in fact, is the true owner."). "There are several indicia of ownership. Title is one. Possession is another. The rights to transfer and to exercise control over property are also indicia of ownership." *Hoffman v. Connell*, 73 Cal.App.4th 1194, 1200, 87 Cal.Rptr.2d 272 (1999). Therefore, the fact that the Chevy Tahoe is titled in Petitioner's name does not conclusively establish her ownership. *See e.g. United States v. One 1971 Porsche Coupe*, 364 F.Supp. 745, 748 (E.D.Pa.1973) (holding forfeited vehicle's owner of record was only a nominal owner since he had made a gift of the vehicle to his son, and the son had "sole possession and exercised dominion and control over it").

## III. Discussion

### A. Petitioner's Evidence

Petitioner contends that she is the true owner of the Chevy Tahoe. To support her claim, she offered documents showing she purchased the Chevy Tahoe from San Diego Imports Center on June 25, 2003 for $12,091.75. (Exhibit A to Pet. Supp. Mem.) According to the sales contract, she paid $11,000 cash and financed $1,091.75. (*Id.*) Petitioner is the registered owner of the vehicle. (Exhibit B to Pet. Supp. Mem.) The Chevy Tahoe is also insured under Petitioner's name and her name is listed on a repair bill for a brake job that was performed on the vehicle in March 2004. (Exhibits C and D to Pet. Supp. Mem.)

At the hearing, Petitioner testified that the $11,000 cash she used to purchase the Chevy Tahoe came from her ex-husband, her sister, and her niece. She said it took her two years to "get together" the remaining $1,091.75. Petitioner testified that she did not register the vehicle in her name until 2005, even though she purchased it in 2003. She explained the registration was left in the name of the seller, San Diego Imports, until she paid off the $1,091.75 loan. (App. A to Gov't Supp. Mem., at 14–15.)

Petitioner further testified that she personally paid for the registration, insurance, and maintenance on the Chevy Tahoe. She stated that no one else had ever paid those costs for her or reimbursed her for those costs. Petitioner testified that she allowed Walker to drive the vehicle, but stated that she drove it more often than he did. She also said Walker never referred to the Chevy Tahoe as being 'his truck' in her presence. (App. A to Gov't Supp. Mem., at 3–5.)

In addition to her own testimony, Petitioner relies on the testimony of Michael Bento.[2] Mr. Bento is Petitioner's neighbor. He testified that he saw the Chevy Tahoe parked in Petitioner's assigned parking spot. He stated that in his opinion, the vehicle was there as often as he saw any other cars.[3] He also said he saw Petitioner drive the vehicle and wash it. However, he admitted that there were occasions where he saw the Chevy Tahoe being driven, but could not see who the driver was. (Exhibit E to Pet. Supp. Mem., at 31–35, 37.)

### B. Government's Evidence

The Government argues that Petitioner is merely the nominal owner of the Chevy Tahoe and that Walker is the true owner because he exercised actual dominion and control over the vehicle. The Government theorizes Walker placed legal title in Petitioner's name to shield his assets from criminal forfeiture in the event he was arrested. At the hearing, the Government introduced several documents and offered the testimony of Detective Gary Avalos, who was head of the surveillance team watching Walker; Agent Robert Harris, an FBI special agent involved in investigating Walker; Foy Hamilton, Walker's former co-worker; and Lynn Morris, an FBI asset forfeiture specialist.

Detective Gary Avalos testified that he conducted surveillance of Walker approximately 3–4 days per week during the 60 day period of wire interceptions from September 2007 to November 2007. During that time, he saw Walker drive the Chevy

---

**2.** Although the Government called Mr. Bento as a witness at the hearing, Petitioner initially provided a declaration from him in support of her petition. (*See* Exhibit E to Pet. Reply.)

**3.** Mr. Bento recanted part of his previously filed declaration, where he stated he saw the Chevy Tahoe in Petitioner's parking spot "on a daily basis for several years." (*See* Exhibit E to Pet. Supp. Mem., at 32, 36.)

Tahoe approximately 25 to 30 times, and he observed the vehicle parked outside Walker's apartment. He stated he never saw anyone else drive the vehicle. Detective Avalos further testified that when he conducted surveillance at Petitioner's house, he never saw the Chevy Tahoe parked there.

Agent Robert Harris testified that he was the agent principally in charge of the wire intercepts this case. Agent Harris stated that there were several intercepted conversations between Petitioner and Walker where the Chevy Tahoe was mentioned or discussed.

In one series of conversations that took place over a two day period, Walker directed Petitioner to go to the DMV and register the Chevy Tahoe for him and he provided the funds for the transaction. On November 11, 2008, Walker stated "I need you to go to DMV and get my um, registration for my truck." Petitioner agreed, and Walker replied "I'm going to have to get you the money then." (Exhibit 3 to Gov't Supp. Mem., at 2–3.) The next morning, Petitioner told Walker she was planning to stop at the DMV. Walker reminded her "Yeah, but the money is at the house." When Petitioner said she was going to turn around and get it, Walker said "tell Kevin[4] I said give you $200, and . . . let him know how much the registration is." Petitioner then handed the phone to Kevin and Walker instructed him to give Petitioner $200. Walker explained, "cause she needs to register my truck. I need to get my stickers. They're getting ready to expire." (Exhibit 4 to Gov't Supp. Mem., at 1–2). Walker called Petitioner back a few minutes later to tell her and Kevin how to distribute the money that would be left over from the transaction. He told Petitioner, "There's going to

be like $80 left over. Give [Kevin] $30." To Kevin he said "after she gets the stickers . . . [t]here's going to be some change left over. She's going to give you $30, and she's going to keep the rest." (Exhibit 5 to Gov't Supp. Mem., at 1.) A little while later, Petitioner called Walker to ask him for the "the year, the make of the car, and um, the license plate number if you have it." Walker told her it was a 1998 Chevy Tahoe and reminded her that "[i]t's in your name, it's, your Tahoe" and suggested that the DMV would be able to pull up the vehicle record using Petitioner's name. (Exhibit 6 to Gov't Supp. Mem., at 1–2.)

In another conversation, Walker told Petitioner he had provided the money for the insurance on the vehicle: "I got all the insurance on the cars and everything, so . . . ain't nothing, ain't nothing you got to be worried about, all that's taken care of." (Exhibit 3 to Gov't Supp. Mem., at 2.) He also said he was planning to take the Chevy Tahoe in for maintenance: "Time for me to put my truck in the shop . . . get my little tune up and everything on it." (*Id.* at 4.)

In the transcripts of Petitioner's and Walker's conversations, Walker also referred to the Chevy Tahoe as his truck several times. *See e.g.* Exhibit 2 to Gov't Supp. Mem., at 2 ("SUV just like mine," "truck just like mine with the same 22s"); Exhibit 3 to Gov't Supp. Mem., at 2, 4 ("my um, registration for my truck," "My truck," "my truck," "my little tune up"); Exhibit 4 to Gov't Supp. Mem., at 2 ("my truck," "my truck," "my stickers"); *see also* Exhibit 6 to Gov't Supp. Mem., at 1 (Petitioner stating "your license plate").

Agent Harris also testified that Walker used the Chevy Tahoe to transport narcotics. Walker was seen driving the Chevy

4. Kevin Harris was a co-conspirator of Walker's. Apparently he was a passenger in Petitioner's vehicle.

Tahoe to meetings with narcotics suppliers. The agents knew Walker's activities were drug-related based on real time information they had from the intercepted conversations. Agent Harris conceded that he did not have any information from any source that the information in the documents attached to the petition, including the sales contract, title, insurance documents, or the 2004 repair bill, was incorrect. (Exhibit E to Pet. Supp. Mem., at 9–10.)

Foy Hamilton testified that he is a senior led driver at AVIS Rental Car and used to work with Walker. Mr. Hamilton stated that Walker was employed as a shuttle driver for approximately four months. He explained that one of his duties was to pick up shuttle drivers from an overflow parking lot when they arrived for work. Mr. Hamilton testified that every time he saw Walker come to work, he drove the Chevy Tahoe. He never saw Walker drive any other vehicle. (App. A to Gov't Supp. Mem., at 16–19.)

Lynn Morris testified that she conducted the property inventory of the Chevy Tahoe when it was seized. She stated the vehicle appeared as if a man "either lived in or out of the car." It contained men's clothing, slippers and cologne, cigars, a basketball, San Diego Chargers flags, unopened beer bottles, CD's from various hip-hop artists, toilet paper, and soap. Ms. Morris stated that the majority of the written documents found in the vehicle bore Walker's name. The documents included a vehicle smog certificate, an envelope from a prison inmate, a document relating to AA/NA meetings, a pay stub, home care instructions from Sharp Medical Group, and a $36 payment to an insurance company. Ms. Morris also stated there were documents that bore Petitioner's name. Those documents included the vehicle registration card, insurance cards, a repair invoice, and some other DMV documents. (App. A to Gov't Supp. Mem., at 22–24.)

### C. Analysis

■ It is not disputed that Walker used the Chevy Tahoe in the commission of his drug crimes. The issue here is whether Petitioner or Walker had a superior interest in the Chevy Tahoe at the time of the commission of the crimes.

At the hearing, Petitioner testified that no one else paid or reimbursed her for the costs to register or insure the Chevy Tahoe. The Government's evidence, however, showed otherwise. The intercepted conversations made it apparent that Walker provided the funds for the both the registration and the insurance. (Exhibits 3–5 to Gov't Supp. Mem.) Petitioner further testified that Walker never referred to the vehicle as 'my truck' in her presence. Yet, in the intercepted calls Walker referred to the Chevy Tahoe as his numerous times. (Exhibits 2–4 to Gov't Supp. Mem.) Petitioner also testified that San Diego Imports was the prior registered owner. Again, the Government's evidence indicates her statement was not accurate. DMV documents provided by the Government show that Kevin Harris (Walker's co-conspirator who Walker instructed to give Petitioner $200 to pay the Chevy Tahoe's registration) was the prior registered owner. (Exhibit 1 to Gov't Supp. Mem., at 5.)

Petitioner's untruthful and/or misleading testimony concerning the vehicle undermines the credibility of her testimony, which is central to her claim. For example, Petitioner's testimony was the sole evidence regarding the source of funds for the purchase of the Chevy Tahoe. Although Petitioner offered the sales contract bearing her name, she did not offer any other evidence to prove that the $11,000 in cash came from her ex-husband, sister and niece. Because Petitioner testi-

fied falsely about paying for the registration and insurance, the Court cannot credit her testimony about the purchase money.

Even giving Petitioner the benefit of the doubt that initially she was more than a nominal owner, the weight of the evidence shows that at the time of the offense, Walker had sole possession and exercised dominion and control over the vehicle.

As evidenced by the testimony of Detective Avalos and Foy Hamilton, Walker routinely drove the Chevy Tahoe during the wiretap period. In fact, neither Detective Avalos or Mr. Hamilton saw Walker drive any other vehicle. Petitioner claims that she drove the vehicle more often than Walker, and cites Michael Bento's testimony (that he saw the Chevy Tahoe in her parking spot) as evidence of her possession. However, Bento recanted part of his declaration, saying that he could not truthfully say he saw the vehicle in her spot on a daily basis. He also said he didn't pay much attention to the Chevy Tahoe and admitted that he could not see who was actually driving the vehicle. Moreover, the fact Mr. Bento saw the Chevy Tahoe in Petitioner's spot is not necessarily probative of her possession, because Walker would stay overnight at Petitioner's house when he had a meeting with his parole officer.[5] (App. A to Gov't Supp. Mem., at 5–7.) In addition, the Government's supplemental briefing points out that on September 17, 2006, Walker was stopped by police while driving the Chevy Tahoe. (Exhibit 14 to Gov't Supp. Mem.) Therefore, it appears Walker's use of the vehicle spanned a period longer than the few months prior to his arrest.

Walker's sole possession of the Chevy Tahoe is further evidenced by the fact that it was filled with his personal belongings when it was seized. The evidence also shows Walker was responsible for all the expenses related to the vehicle, including the registration, insurance, and maintenance.

In addition to the evidence of physical possession and financial responsibility, Walker talked about the Chevy Tahoe with Petitioner as if it were his vehicle. Indeed, Walker referred to the Chevy Tahoe as 'my truck' numerous times, without correction from Petitioner. Furthermore, Petitioner appeared to be unfamiliar with the vehicle. She did not know its make, model, or year. Her testimony about the purchase transaction was confused and her testimony about the vehicle's history of record ownership was inaccurate. Petitioner's lack of familiarity with the vehicle undermines her claim that she is the true owner.

## IV. Conclusion

Based on the foregoing, Petitioner has failed to demonstrate, by a preponderance of the evidence, that her right, title, or interest in the Chevy Tahoe "was vested the petitioner rather than the defendant or was superior to any right, title, or interest of the defendant at the time of the commission of the acts which gave rise to the forfeiture of the property." § 853(n)(6)(A). Accordingly, Petitioner's claim to the Chevy Tahoe is **DENIED.**

**IT IS SO ORDERED.**

---

5. Petitioner admitted that she knew Walker's parole officer thought he was living with her, when, in fact, he was living in an apartment at Rolando Court. Petitioner testified when Walker's parole officer would call to check in on him, she would contact Walker so he could spend the night at her house. That way, Walker would be there when his parole officer came by. (App. A to Gov't Supp. Mem., at 6–7.)