Filed 11/19/15  Angotti & Reilly v. Rincon Residential Towers CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| ANGOTTI & REILLY, INC., <br><br> Plaintiff and Appellant, <br><br> v. <br><br> RINCON RESIDENTIAL TOWERS LLC, <br><br> Defendant and Respondent. | A140648 <br><br> (San Francisco County <br> Super. Ct. No. CPF-10-510383) |

Appellant Angotti & Reilly, Inc. (A&R) is a general contractor that provided construction services for respondent Rincon Residential Towers LLC (Rincon).  After Rincon refused to pay A&R's last few invoices, A&R pursued and prevailed in an arbitration, winning an award of over $700,000, plus attorney fees and penalties.  The trial court confirmed the arbitration award, but Rincon could not satisfy the judgment.  A&R then moved to join Rincon's primary member, Richard Cohen, as a judgment debtor under an alter-ego theory.  The trial court denied the motion.  We affirm.

BACKGROUND

In January 2008, A&R partially renovated Rincon Center (the Center), a commercial and residential building in San Francisco, under a contract with Rincon.  By the time work was finished, A&R had submitted invoices for $7.3 million.  Rincon paid all of the invoices except the final three, leaving an unpaid balance of $766,420.  An arbitrator awarded that amount, along with attorney fees and penalties, to A&R, and this award was confirmed by the trial court.  After A&R was unable to obtain satisfaction of

1

the award from Rincon, it moved to join Cohen as a judgment debtor on the theory that, under Code of Civil Procedure section 187, he was an alter ego of Rincon.

Whether the two were alter egos depends, of course, on their relationship, and we therefore turn to describe it in some detail. Cohen is the founder and president of Capital Properties, a real estate investment company that, in 2008, owned four million square feet of commercial space and 18,000 apartments. Rincon is a Delaware limited-liability company, of which Cohen and a family trust are its only members.[1]

The Center was purchased in June 2007 by two limited-liability companies owned by Cohen and entities under his control. Cohen contributed over $34 million to the purchase, while the remainder was financed with a $110 million secured loan from Bear Stearns Commercial Mortgage, Inc. (the loan).[2] The loan had a two-year term, with an option to extend for an additional year. Rincon was characterized as a "borrower" in the loan agreement, but it was not the building's owner. The building was owned by the two limited-liability companies, which leased the Center to Rincon. Rincon, in turn, retained another Cohen-controlled entity to provide management services.

Rincon and the two limited-liability companies are "single[-]purpose entities," which are commonly used in real estate transactions. These entities are structured to insulate the repayment of a loan from other debts of the equitable owner of real estate, thereby enhancing the security and marketability of the loan. Cohen was required by the loan agreement to use single-purpose entities for the Center's purchase.

Under the loan agreement, the lender, not Cohen, controlled the income generated by the Center. Rincon was required to establish in trust a "lockbox account" that was

---

[1] The owners of limited-liability companies are technically referred to as members, not shareholders. But we will periodically refer to them as shareholders since the term is more common and the distinction between the two terms makes no difference under the law of alter ego.

[2] Bear Stearns was an early victim of the Great Recession, and the loan was eventually controlled by successors in interest. We will refer to Bear Stearns, entities operating on behalf of Bear Stearns, and Bear Stearns's successors in interest collectively as the "lender."

2

under the exclusive control of the lender. The Center's tenants were required to make rent payments to the lockbox account, rather than to Cohen. The funds in the lockbox account were then released, at the direction of the lender, to pay project expenses according to a hierarchy established by the loan agreement, with taxes and insurance at the top, operating expenses in the middle, and distributions to Cohen at the bottom.

When funds were released to Rincon to pay expenses, the funds were transferred to a "controlled disbursement account" held in the name of Capital Properties Services LLC, yet another Cohen-controlled entity, on which payment checks were written. According to Rincon's treasurer, "[o]ther than the use of this cash management procedure at the time checks were written for the Property, all of the revenue from the Property was kept in segregated accounts and was not commingled with other funds."

In 2007, the Center produced rental income of $2.8 million. At the time the property was purchased, Cohen believed that the Center's tenant occupancy was below its potential, and his plan was to renovate the building, which had 320 apartment units, into a luxury residential complex. In addition to his purchase money, he contributed over $3.5 million for initial debt service and $5.8 million for anticipated renovations. Subsequently, Rincon contracted with A&R for the sum of $5.9 million for the renovations, which it planned to pay for from Cohen's contributions and from income produced by the Center.

By 2008, the Center's income had grown to $5.4 million. This increase was enough to cover the Center's operating expenses, but it was inadequate to also cover debt service. Between 2007 and 2010, Cohen contributed an additional $13 million to the project. In a trial brief filed in connection with subsequent litigation, Rincon stated that a "shortfall was anticipated for the beginning of Rincon's ownership of the Property—this was a value-add property, and [Cohen] had expected that it would be necessary to invest money to make the Property profitable."

As explained by Rincon's treasurer, between January and March 2009, the lender failed to release funds that would have paid for the Center's operating expenses, even though sufficient funds were available in the lockbox account. Cohen provided about

3

$700,000 to cover the shortfall. In April, the lender disbursed sufficient funds to cover the operating expenses accrued during the first part of the year, and Rincon used some of these funds to reimburse Cohen the money he had provided.[3]

In the end, there was insufficient money to pay all the bills. Rincon attributed the shortfall to the Great Recession, which began shortly after Cohen bought the Center.[4] Within nine months of buying the Center, Cohen concluded that its value was considerably diminished, and he began having conflicts with the lender about releasing funds to pay expenses. By the time the loan came due in June 2009, Cohen was in default. During subsequent negotiations, he was unable to reach agreement with the lender, and he eventually lost the property through a foreclosure on the loan.

The record generally shows that the Cohen-controlled entities directly involved in the Center were more legal constructs than operating businesses and that Cohen treated them as part of his larger real estate investment business, rather than as separate and independent businesses.[5] Rincon, for example, had no employees, despite being the putative lessee of the Center. The people who dealt with A&R on behalf of Rincon were all employees of Capital Properties. And, as A&R points out, Capital Properties claimed in public relations documents to be the owner and manager of the Center, although as an entity it was actually neither.

In its written order denying A&R's motion to join Cohen as a judgment debtor, the trial court recognized that Cohen was the sole owner of the entities and that the entities shared employees. But it found that A&R had nevertheless failed to prove a sufficient unity of interest between Rincon and Cohen to establish that Cohen was Rincon's alter

_____

[3] We cannot determine the degree of formality of this transaction because the treasurer's declaration is not accompanied by any relevant documentation.

[4] While it is reasonable to believe that the recession caused or exacerbated the Center's financial problems, there is no actual evidence in the record to support the proposition. This is one of many instances in which a citation to the record in Rincon's brief provides only tenuous support for the brief's corresponding assertion.

[5] We refer to the activities of Cohen and the entities he controlled as those of "Cohen" with the understanding that certain activities may have been taken by employees of Cohen-controlled entities on Cohen's behalf, rather than by Cohen personally.

4

ego. The court also rejected A&R's contention that Rincon was undercapitalized, and it found no evidence that Cohen commingled his personal funds with Rincon's or gave assurances that he would be personally responsible for Rincon's debts. Finally, the court held that, even assuming a sufficient unity of interest, A&R still failed to demonstrate that the corporate form was misused or that it would be inequitable for the court to allow the corporate form to stand.

## DISCUSSION

We begin our analysis by reviewing the applicable law governing limited corporate liability and piercing the corporate veil. "Ordinarily, a corporation is regarded as a legal entity, separate and distinct from its stockholders, officers and directors, with separate and distinct liabilities and obligations. [Citation.] A corporate identity may be disregarded—the 'corporate veil' pierced—where an abuse of the corporate privilege justifies holding the equitable ownership of a corporation liable for the actions of the corporation. [Citation.] Under the alter ego doctrine, then, when the corporate form is used to perpetrate a fraud, circumvent a statute, or accomplish some other wrongful or inequitable purpose, the courts will ignore the corporate entity and deem the corporation's acts to be those of the persons or organizations actually controlling the corporation, in most instances the equitable owners." (*Sonora Diamond Corp. v. Superior Court* (2000) 83 Cal.App.4th 523, 538 (*Sonora*).)[6] "[W]hile the [alter ego] doctrine does not depend on the presence of actual fraud, it is designed to prevent what would be fraud or injustice, if accomplished. Accordingly, bad faith in one form or another is an underlying consideration and will be found in some form or another in those cases wherein the trial court was justified in disregarding the corporate entity." (*Associated Vendors, Inc. v. Oakland Meat Co.* (1962) 210 Cal.App.2d 825, 838; see

---

[6] Cohen argues that we should apply Delaware law, which, according to him, is more restrictive than California law in imposing alter ego liability. But even if Delaware law is more restrictive, we need not apply it given our conclusion that A&R failed to carry its burden under California law. (See *Greb v. Diamond Internat. Corp.* (2013) 56 Cal.4th 243, 248, fn. 5 ["The circumstance that 'two states are involved does not in itself indicate that there is a "conflict of laws" or "choice of laws" problem' "].)

5

similarly, *Greenspan v. LADT LLC* (2010) 191 Cal.App.4th 486, 510 [alter ego arises when " 'an opposing party is using the corporate form unjustly' "].)  " 'Alter ego is an extreme remedy, sparingly used.' " (*Hasso v. Hapke* (2014) 227 Cal.App.4th 107, 155.)

Because of the equitable, fact-specific nature of the alter ego analysis, "[o]nly general rules may be laid down for guidance." (*Associated Vendors, Inc. v. Oakland Meat Co., supra,* 210 Cal.App.2d at p. 837.)  "There is no litmus test to determine when the corporate veil will be pierced; rather the result will depend on the circumstances of each particular case.  There are, nevertheless, two general requirements:  '(1) that there be such unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist and (2) that, if the acts are treated as those of the corporation alone, an inequitable result will follow.' " (*Mesler v. Bragg Management Co.* (1985) 39 Cal.3d 290, 300.)  Among the factors considered by courts in determining whether to pierce the corporate veil to hold an individual shareholder liable for corporate debts are "the commingling of funds and other assets; the failure to segregate funds of the individual and the corporation; the unauthorized diversion of corporate funds to other than corporate purposes; the treatment by an individual of corporate assets as his own; . . . the representation by an individual that he is personally liable for corporate debts; the failure to maintain adequate corporate minutes or records; the intermingling of the individual and corporate records; . . . the concealment of the ownership of the corporation; the disregard of formalities and the failure to maintain arm's-length transactions with the corporation; and the attempts to segregate liabilities to the corporation." (*Mid-Century Insurance Co. v. Gardner* (1992) 9 Cal.App.4th 1205, 1213, fn. 3 (*Gardner*).)

Ultimately, "[i]t is the plaintiff's burden to overcome the presumption of the separate existence of the corporate entity." (*Gardner, supra,* 9 Cal.App.4th at p. 1212.)  " '[T]he matter is particularly within the province of the trial court.  [Citations.]  This is because the determination of whether a corporation is an alter ego of an individual is ordinarily a question of fact.' . . .  '[S]ince this determination is . . . not a question of law,

the conclusion of the trier of fact will not be disturbed if it is supported by substantial evidence.' " (*Misik v. D'Arco* (2011) 197 Cal.App.4th 1065, 1071-1072.)[7]

Applying these principles to the facts here, we cannot find "bad faith in one form or another" (*Associated Vendors, Inc. v. Oakland Meat Co., supra,* 210 Cal.App.2d at p. 838) justifying a reversal of the trial court's decision. The Center was purchased and renovated in an apparent good-faith belief that it would be successful. Cohen not only provided over $9 million in initial funding for Rincon ($3.5 million for initial debt service and $5.8 million for anticipated renovations), but he also made substantial additional capital contributions in the ensuing years. While the single-purpose-entity structure is unusual outside the world of real estate investment, the record demonstrates that it was adopted in this case to satisfy Rincon's lender, not for some underhanded purpose. A&R provided no evidence that Cohen used this corporate structure to frustrate creditors' access to Rincon's assets. Nor did it provide any evidence that Cohen commingled his funds with Rincon's or otherwise disregarded corporate forms. On the contrary, the various restrictions on using the Center's income under the loan agreement virtually precluded such misuse. Furthermore, no evidence was provided that Cohen ever told A&R that he would be personally responsible for Rincon's debts or otherwise gave A&R reason to believe that the corporate form would not be enforced. In short, there was little, if any, evidence of the type of misuse of the corporate form necessary to invoke the "extreme . . ., sparingly used" remedy of alter ego liability. (*Hasso v. Hapke*, *supra*, 227 Cal.App.4th at p. 155.)

The only example of potential misconduct was Rincon's April 2009 distribution of $700,000 to Cohen. As discussed above, earlier that year Cohen had contributed an equivalent amount to Rincon because the lender failed to release otherwise available

---

[7] A&R argues we should review the trial court's order de novo, but it cites no pertinent authority supporting this position. Assuming, as A&R argues, that the facts are not in significant dispute, the existence of undisputed facts does not convert the fundamentally factual issue before trial court into an issue of law. As innumerable cases have held, we must affirm an alter ego finding if substantial evidence supports the determination of the trial court.

funds. The April 2009 distribution was to reimburse Cohen when the lender released the funds. In effect, Cohen extended a bridge loan to Rincon, and the transaction did not result in a net diminution of Rincon's capital. This was therefore not a situation in which a shareholder drained the corporation of assets to frustrate creditors. (Compare, *Danko v. O'Reilly* (2014) 232 Cal.App.4th 732, 738 [shareholder withdrew corporate assets while aware of sizable outstanding debt].) Even if, as A&R claims, the transaction was illegal because Rincon's liabilities exceeded its assets at the time of the distribution, the trial court could properly find this isolated incident was an insufficient breach of corporate formalities to justify piercing the corporate veil.

A&R argues that the arbitrator's finding that Rincon acted in bad faith in refusing to pay its final invoices should be attributed to Cohen. Putting aside the issue of attribution, the alter ego doctrine does not impose liability merely because a shareholder acted in bad faith *in some manner*. Rather, the bad faith must have occurred in connection with the shareholder's use of the corporate form. (*Greenspan v. LADT LLC, supra,* 191 Cal.App.4th at p. 510.) Because the arbitrator's finding of bad faith related to the plausibility of Rincon's various defenses to payment, rather than to any use by Cohen of the limited-liability entities, it fails to satisfy the doctrine's requirements.

A&R's basic complaint is that Rincon's money ran out before A&R was fully paid, but that is the risk a creditor takes in dealing with a limited-liability entity: if the entity fails, there may be insufficient money to pay all creditors. Case authority has repeatedly held that the purpose of the alter ego doctrine is not to protect unsatisfied corporate creditors. (E.g., *Sonora, supra,* 83 Cal.App.4th at 539 ["The alter ego doctrine does not guard every unsatisfied creditor of a corporation but instead affords protection where some conduct amounting to bad faith makes it inequitable for the corporate owner to hide behind the corporate form. Difficulty in enforcing a judgment or collecting a debt does not satisfy this standard"]; *Gardner, supra*, 9 Cal.App.4th at 1213 [" 'Certainly, it is not sufficient to merely show that a creditor will remain unsatisfied if the corporate veil is not pierced, and thus set up such an unhappy circumstance as proof of an "inequitable result." In almost every instance where a plaintiff has attempted to invoke the doctrine he

8

is an unsatisfied creditor' "].)  Rather, the doctrine is employed as a remedy in extraordinary circumstances when the corporate form has, in some manner, been abused to cheat creditors.  A&R failed to provide significant, if any, evidence of such abuse.

A&R argues that Cohen's status as, in effect, the sole shareholder of the various entities involved in the Center's purchase and renovation demonstrates a sufficient unity of interest to satisfy the alter ego doctrine.  But this argument misunderstands the doctrine.  Even if we assume that Cohen exercised complete control over the Center and the limited-liability entities involved in it, a corporation and its sole shareholder are not unified in interest merely because the shareholder controls the entity's activities.  As noted in *Gardner*, supra, 9 Cal.App.4th 1205, a shareholder's "domination of ownership and control . . . is not significant in isolation."  (*Id.* at p. 1215; see similarly, *Leek v. Cooper* (2011) 194 Cal.App.4th 399, 415 ["An allegation that a person owns all of the corporate stock and makes all of the management decisions is insufficient to cause the court to disregard the corporate entity"].)  If exclusive control were sufficient, the corporate form would be meaningless whenever an incorporated business had a single shareholder.  Instead, when an individual shareholder is alleged to be an alter ego, the creditor must demonstrate a unity of interest through proof that the shareholder failed to respect the corporate entity, typically by failing to maintain the distinction between corporate and personal assets and activities.  This is evidenced by, for example, the shareholder's failure to segregate personal and corporate funds, diversion of corporate funds for other than corporate purposes, failure to maintain adequate or separate corporate records, and failure to maintain arm's-length transactions with the corporation.  (*Gardner,* at p. 1213, fn. 3; see *Minton v. Cavaney* (1961) 56 Cal.2d 576, 579 ["The equitable owners of a corporation . . . are personally liable when they treat the assets of the corporation as their own and add or withdraw capital from the corporation at will"].)  There is no evidence of this type of conduct.

A&R spends much of its brief pointing out that the various limited-liability entities involved in the Center did not function independently, since they lacked, among other things, employees and business assets.  This type of evidence can be used in proving a

9

unity of interest *among the various entities* themselves, but it is of little or no significance in demonstrating a unity of interest between an individual shareholder and his or her corporations. The case on which A&R places primary reliance, *Toho-Towa Co. v. Morgan Creek Products, Inc.* (2013) 217 Cal.App.4th 1096 (*Toho-Towa*), demonstrates this distinction. *Toho-Towa* featured three corporations owned and controlled by a single shareholder. As part of a business transaction, the shareholder required the plaintiff to contract with two of the corporations. When the plaintiff obtained a judgment against these corporations, however, it discovered that the shareholder had structured the relationships among the corporations to steer all income to the third corporation, leaving the contracting corporations as judgment-proof shells. The plaintiff sought, and was allowed, to join the third corporation as a judgment debtor on the theory that the three corporations were alter egos of each other, under the "single[-]business enterprise" doctrine. (*Id.* at pp. 1101-1102, 1104, 1108.) Under this doctrine, the structuring of relationships among commonly owned corporations and the mingling of assets and employees can be used to demonstrate a unity of interest among the corporations. " 'The "single-business-enterprise" theory is an equitable doctrine applied to reflect partnership-type liability principles when corporations integrate their resources and operations to achieve a common business purpose.' " (*Toho-Towa,* at p. 1108.) The doctrine does not, however, extend the alter ego finding to shareholders of the corporations. The plaintiff in *Toho-Towa* sought to join only the third corporation, not the controlling shareholder, as an additional judgment debtor.

A&R has not attempted to join any of Cohen's other limited-liability entities as judgment debtors. Rather, the object of its motion was Cohen himself, and therefore the primary issue before the trial court was Cohen's relationship with the entities, not their relationships with each other. So long as Cohen respected the corporate boundaries between himself and Rincon and the other entities, which he did, the common use of assets and employees by those entities does not justify dissolving the corporate barriers shielding him as an individual. (*Toho-Towa, supra,* 217 Cal.App.4th at p. 1107 [different standards used when holding one corporation liable for debts of another than when

10

holding shareholder liable]; *Gardner*, *supra,* 9 Cal.App.4th at p. 1213 [noting that certain factors applied in reaching another corporation are not relevant to alter ego claim against an individual].)  In other words, A&R's attempt to prove a single-business enterprise has little to do with Cohen's status as the alter ego of that enterprise.

A&R also contends that Cohen "manipulated assets and liabilities to make Rincon a hollow shell" (initial capitalization changed to lower case; boldface omitted) and notes that entities other than Rincon owned the Center and received the income from it.  Even assuming A&R's claim is true, the claim would not necessarily make Cohen liable for Rincon's debts.  If A&R believed that Cohen structured the project to shelter assets in corporate entities other than Rincon, as was the case in *Toho-Towa, supra,* 217 Cal.App.4th 1096, it could have sought to join those entities as corporate debtors.  But such a structure would not, standing alone, justify reaching through the corporate barriers to Cohen himself.

In any event, there is no merit to A&R's contention.  It is true that the provisions of the loan agreement kept funds out of Rincon's possession and channeled them to the lockbox account.  But rather than compromising creditors' interests, this *helped* to insure that creditors would be paid, since the loan agreement's payment hierarchy required payments to go to them before Cohen.[8]  Furthermore, Cohen made sizable capital contributions to pay project expenses, both when the Center was purchased and as its financial problems grew.  These contributions allowed creditors to be paid more than would have been possible from only the income generated by the Center.  Accordingly, the reason the creditors' claims were not fully paid was not because of Rincon's structure but was instead because the Center failed to generate enough income.  As we have discussed, such a failure, standing alone, is not a basis for imposing alter ego liability.

---

[8] A&R points to the provisions of the loan agreement requiring debt service to be paid before other types of expenses.  But the lender was a creditor of Rincon, just like A&R. That Rincon's agreement favored the lender over A&R provides no basis for finding Cohen to be an alter ego of Rincon.

11

A&R also cites the payment of management and construction-supervision fees to entities controlled by Cohen.  It has made no attempt, however, to demonstrate that these fees were not rendered in return for actual services or that their amount was disproportionate to the value of the services provided.  Further, as A&R itself notes, there was nearly $2 million in unpaid debts to these entities by the end of 2009, far more than the outstanding debt to A&R.  Given these facts, the trial court had no basis for finding that Cohen used payments to these entities to frustrate creditor claims.  A&R relies on *Alexander v. Abbey of the Chimes* (1980) 104 Cal.App.3d 39, in which the sole shareholder, during the pendency of the litigation, caused all assets of the corporation to be sold in return for promissory notes payable to the shareholder himself, thereby draining the corporation of assets.  (*Id.* at pp. 47-48.)  Nothing comparable occurred here.

A&R also argues Rincon was undercapitalized.  As explained by the Supreme Court in *Automotriz etc. De California v. Resnick* (1957) 47 Cal.2d 792, the type of undercapitalization necessary to support a finding of alter ego results when the debtor corporation " 'is organized and carries on business without substantial capital in such a way that the corporation is likely to have no sufficient assets available to meet its debts . . . .  It is coming to be recognized as the policy of the law that shareholders should in good faith put at the risk of the business unencumbered capital reasonably adequate for its prospective liabilities.  If the capital is illusory or trifling compared with the business to be done and the risks of loss, this is a ground for denying the separate entity privilege.' " (*Id.*, at p. 797.)

Cohen invested over $34 million in the Center as a down payment on the loan when it was purchased and further capitalized Rincon with more than $9 million.  A&R made no attempt to prove that these infusions, at the time they were made, were " 'illusory or trifling compared with the business to be done and the risks of loss.' " (*Automotriz etc. De California v. Resnick*, *supra,* 47 Cal.2d at p. 797.)  Nor do we find any reason to make such a presumption.  When purchased, the Center was already an income-generating business.  Its income nearly doubled from 2007 to 2008, and Cohen's business plan anticipated further increases.  Given the lack of any analysis in the record

12

of the nature of the potential income under Cohen's business plan, there is no basis to presume that $9 million, on top of the substantial down payment, was illusory or trifling.[9] (See, e.g., *Minton v. Cavaney, supra*, 56 Cal.2d at p. 580 [corporation undercapitalized when it "never had any substantial assets"].)

A&R argues that we must conclude that the initial capital was inadequate because Cohen believed when the Center was bought that further capital contributions would be necessary for the Center to succeed. Perhaps A&R's argument would be convincing if Cohen had made no additional capital contributions. But, in fact, he *did* make such contributions by infusing an additional $13 million to the project after his original $9 million capitalization. (See *Sonora, supra,* 83 Cal.App.4th at p. 546 [including subsequent infusions in calculating capitalization].)

The nature of A&R's claim of undercapitalization is revealed in its primary section heading, which argues "Cohen withheld capital he knew Rincon needed." (Initial capitalization changed to lower case; boldface omitted.) But contrary to A&R's apparent assumption, a sole shareholder has no obligation to make capital contributions to pay creditor claims, assuming the corporation was otherwise properly capitalized. A&R supports its argument with a detailed analysis of the project's finances to show that certain liabilities remained unaddressed by Cohen's on-going capital contributions, arguing "unencumbered capital was not available to cover all of Rincon's obligations and operating losses." (Italics and boldface omitted.) This type of post hoc analysis, however, is of little relevance to the issue of adequate capitalization. A corporation cannot be found undercapitalized merely because the claims of some creditors cannot be satisfied. (*Sonora, supra,* 83 Cal.App.4th at 539; *Gardner*, *supra*, 9 Cal.App.4th at p. 1213.) Rather, the amount of capital supplied to the corporation must be unreasonable, given its likely income, expenses, and risks at the time the business venture was undertaken. As discussed above, the record lacks sufficient evidence and analysis to

---

[9] The burden was on A&R, not Rincon, to prove the facts underlying an imposition of alter ego liability. (*Gardner*, *supra*, 9 Cal.App.4th at p. 1212.)

13

demonstrate such an undercapitalization, and the amount of capital supplied by Cohen was sufficient to preclude a finding of inadequacy in the abstract.

A&R also contends alter ego liability should be imposed because it was given assurances of payment at a time when Rincon was short of funds. It is true that one factor in finding a unity of interest is a shareholder's representation that he or she will be personally liable for corporate debts. (*Gardner, supra,* 9 Cal.App.4th at p. 1213, fn. 3.) But the assurances cited by A&R constituted, at most, representations by an employee of Capital Properties that A&R would eventually be paid *by Rincon.* The primary "assurance" relied on by A&R was an e-mail in which a Capital Properties employee told A&R that a particular invoice would eventually be paid and commented that it was "[n]ot an issue of not paying." There is no indication in the e-mail that this representation applied to any debt other than the invoice in question, and that invoice was subsequently paid. As the trial court found, neither Cohen nor anyone else represented that Cohen would pay Rincon's debt.[10]

Finally, A&R argues Cohen used capital contributions in a manipulative way. According to A&R, Cohen made the capital contributions necessary to pay A&R's invoices early in the project, thereby inducing A&R to continue working. Later, Rincon refused to pay invoices after A&R had completed its work. In fact, however, Cohen made substantial further capital contributions after Rincon refused to pay A&R, and the company merely decided to use the capital for other corporate purposes. Thus, this argument is fundamentally the same as A&R's argument that Rincon was undercapitalized because it lacked sufficient capital to pay all its debts. It fails because Cohen was not required to make capital contributions necessary to satisfy all corporate creditors.

---

[10] A&R cites *Toho-Towa, supra,* 217 Cal.App. 4th 1096 for the proposition that it is not necessary for a shareholder to make personal assurances of payment in order to impose alter ego liability. But as we have discussed, in *Toho-Towa,* the court imposed alter ego liability on a corporation, not the individual shareholder, under the single-business-enterprise theory.

14

## DISPOSITION

The order of the trial court is affirmed.  Rincon may recover its costs on appeal. (Cal. Rules of Court, rule 8.278(a)(1), (2).)

_____
Humes, P.J.

We concur:


_____
Margulies, J.


_____
Dondero, J.


*Angotti & Reilly v. Rincon* (A140648)